**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| FELICIA MARTI, derivatively on behalf of ARDELYX, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL RAAB, JUSTIN RENZ, SUSAN HOHENLEITNER, ERIC FOSTER, ROBERT BAZEMORE, WILLIAM BERTRAND, JR., MUNA BHANJI, ONAIZA CADORET-MANIER, DAVID MOTT, MERDAD PARSEY, and RICHARD RODGERS,<br><br>Defendants,<br><br>and<br><br>ARDELYX, INC.,<br><br>Nominal Defendant. | Case No.: 1:26-cv-14635<br><br>**JURY TRIAL DEMANDED** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Felicia Marti ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Ardelyx, Inc. ("Ardelyx" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants Michael Raab ("Raab"), Justin Renz ("Renz"), Susan Hohenleitner ("Hohenleitner"), Eric Foster ("Foster"), Robert Bazemore ("Bazemore"), William Bertrand, Jr. ("Bertrand"), Muna Bhanji ("Bhanji"), Onaiza Cadoret-Manier ("Cadoret-Manier"), David Mott ("Mott"), Merdad Parsey ("Parsey"), and Richard Rodgers ("Rodgers") (collectively, the "Individual Defendants," and together with Ardelyx, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Ardelyx, unjust

enrichment, waste of corporate assets, gross mismanagement, abuse of control, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Raab, Renz, Hohenleitner, and Foster for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Ardelyx, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by Ardelyx's current and/or former directors and officers from January 13, 2025 through August 6, 2026, both dates inclusive (the "Relevant Period").

2. Ardelyx is a biopharmaceutical company, headquartered in Waltham, Massachusetts, which develops and commercializes medications, chiefly from the active ingredient Tenapanor. The Company's two primary products are IBSRELA® ("IBSRELA") and XPHOZAH® ("XPHOZAH"), both utilizing Tenapanor.

3. IBSRELA is designed to aid patients suffering from irritable bowel syndrome with constipation, and the Company intends to expand its use to treat chronic idiopathic constipation.

XPHOZAH is designed to aid patients with chronic disease on dialysis, mainly to reduce serum phosphorus.

4. Notable factors affecting the commercial success of IBSRELA and XPHOZAH are their continued reimbursement by healthcare providers, barriers to prior-authorization, and other barriers to patient access. Throughout the Relevant Period, the Individual Defendants repeatedly emphasized the Company's ability to overcome the reimbursement, prior-authorization, and other patient access challenges facing IBSRELA and XPHOZAH, and asserted the commercial viability of the medications.

5. For instance, on February 20, 2025, the Company hosted an earnings call to discuss with investors and analysts its financial results for the fourth quarter and full year 2024 (the "Q4 2024 Earnings Call"). During the Q4 2024 Earnings Call, Defendant Raab asserted that "[***i***]***n the midst of*** [the Company's] ***outstanding performance, we confidently tackled the challenging reimbursement environment. Our commitment to prioritizing patient needs has never wavered. We've taken strong decisive actions and we're dedicated to ensuring that patients continue to have access to XPHOZAH***."[1]

6. The truth fully emerged on August 6, 2026, when the Company issued a press release to announce its financial results for the second quarter of 2026 (the "Q2 2026 Press Release"). The Q2 2026 Press Release reported that the Company's revenue derived from IBSRELA fell below expectations due to "significantly increased utilization management processes from payors." The Q2 2026 Press Release also noted that the Company reduced its full-year 2026 guidance for IBSRELA from $410-$430 million to $350-$370 million and withdrew its

[1] Unless otherwise stated, all emphasis is added.

long-term XPHOZAH revenue guidance, despite reaffirming its 2026 revenue guidance for XPHOZAH.

7. That same day, the Company hosted an earnings call to discuss with investors and analysts its financial results for the second quarter of 2026 (the "Q2 2026 Earnings Call"). During the Q2 2026 Earnings Call, Defendant Foster conceded that "***we experienced significant payer hurdles that had a direct impact on access to IBSRELA***." Defendant Foster added that "new patient starts have been slowed by these hurdles[.]"

8. On this news, the price per share of the Company's common stock fell $0.87, or roughly 17.9%, from a price per share of $4.87 at the close of trading on August 6, 2026, to close at $4.00 on August 7, 2026.

9. Throughout the Relevant Period, in breach of their fiduciary duties owed to Ardelyx, the Individual Defendants willfully or recklessly caused the Company to make materially false and/or misleading statements that failed to disclose, *inter alia*, that: (1) the Company encountered increasingly restrictive payer requirements for its drugs; (2) the Company encountered increasing patient access restrictions; (3) the Company's efforts to address the increasing payer requirements and patient access restrictions were inadequate; (4) as a result of the foregoing, the IBSRELA and XPHOZAH new-patient start rate slowed and harmed the drugs' financial prospects; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

10. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

11. Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while one of the Individual Defendants breached their fiduciary duties by engaging in improper insider sales, netting total proceeds of ***approximately $1.7 million***.

12. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

13. In light of the Individual Defendants' misconduct—which has subjected the Company, its President and Chief Executive Officer ("CEO"), its former Chief Financial and Operations Officer, its Chief Financial Officer ("CFO"), and its former Chief Commercial Officer ("CCO") to a federal securities fraud class action lawsuit pending in the United States District Court for the District of Massachusetts (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

14. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, the majority of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendants Raab's, Renz's, Hohenleitner's and Foster's liability in the Securities Class Action, and of their not being disinterested or independent directors, a majority of the Board cannot consider a demand to commence litigation against themselves and the other

Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

16. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

18. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Company is headquartered in this District.

## PARTIES

### Plaintiff

19. Plaintiff is a current shareholder of Ardelyx. Plaintiff has continuously owned Ardelyx common stock at all relevant times.

**Nominal Defendant Ardelyx**

20. Ardelyx is a Delaware corporation with its principal executive offices at 400 Fifth Avenue, Suite 210, Waltham, Massachusetts 02451. Ardelyx's common stock trades on the NASDAQ Global Market ("NASDAQ") under the ticker symbol "ARDX."

**Defendant Raab**

21. Defendant Raab has served as the Company's President and CEO since March 2009, and as a Company director since 2008.

22. During the Relevant Period, while the Company's stock price was artificially inflated, and prior to the truth emerging, Defendant Raab made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| May 2, 2025 | 41,666 | $4.25 | $177,081 |
| February 24, 2026 | 41,666 | $6.26 | $260,829 |
| March 16, 2026 | 41,666 | $5.84 | $243,329 |
| April 15, 2026 | 41,668 | $6.29 | $262,092 |
| May 15, 2026 | 41,666 | $6.28 | $261,662 |
| June 15, 2026 | 41,666 | $5.67 | $236,246 |
| July 15, 2026 | 41,668 | $5.06 | $210,840 |

Thus, in total, before the fraud was exposed, Defendant Raab sold a total of 291,666 shares of Company common stock on inside information for a total of approximately $1.7 million in proceeds. Defendant Raab's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.[2]

[2] Defendant Raab's insider sales on February 24, 2026, March 16, 2026, April 15, 2026, May 15, 2026, June 15, 2026, and July 15, 2026 were made pursuant to a Rule 10b5-1 trading plan adopted during the Relevant Period, on November 7, 2025.

23. The Schedule 14A the Company filed with the SEC on April 29, 2026 (the "2026 Proxy Statement") stated the following about Defendant Raab:

> **Michael Raab**, age 61, has served as our President and Chief Executive Officer since March 2009 and as a director since 2008. From 2002 to 2009, Mr. Raab was a partner at New Enterprise Associates, an investment firm focused on venture capital and growth equity investments, where he focused on investments in the biotechnology and pharmaceutical sectors. Prior to joining NEA, Mr. Raab spent 15 years in commercial and operating leadership roles in the biotechnology and pharmaceutical industries, including serving as Senior Vice President, Therapeutics and General Manager of the Renal Division at Genzyme Corporation, a biotechnology company. Mr. Raab also spent two years with Genzyme's diagnostic products and services division. Before Genzyme, Mr. Raab held business development and sales and marketing positions at Repligen Corporation (Nasdaq: RGEN), a life sciences company, and Bristol-Myers Squibb Company (NYSE: BMY). Mr. Raab currently serves as a director of Tempest Therapeutics (Nasdaq: TPST) and as a member of the Emerging Companies Section Governing Board and the Health Section Governing Board as well as a member of the Executive Committee of the Biotechnology Innovation Organization. He is also a founding member and the secretary of The Midsized Biotech Alliance of America. In addition, Mr. Raab served as a member of the board of directors of Amicus Therapeutics, Inc. (Nasdaq: FOLD) from 2004 and as its chairperson of the board of directors from March 2024 until its acquisition by BioMarin Pharmaceutical Inc. in April 2026. Mr. Raab received a B.A. from DePauw University. We believe Mr. Raab is qualified to serve on our board of directors based on his role as our President and Chief Executive Officer, his senior management experience in the life sciences sector, his investment experience and his current and past service on other boards of directors of public companies.

**<u>Defendant Renz</u>**

24. Defendant Renz served as the Company's Chief Financial and Operations Officer from January 2023 to November 4, 2025. Previously, Defendant Renz served as the Company's CFO from June 2020 to January 2023.

25. The Schedule 14A the Company filed with the SEC on April 30, 2025 (the "2025 Proxy Statement") stated the following about Defendant Renz:

> **Justin Renz** has served as our Chief Financial and Operations Officer since January 2023, and served as our Chief Financial Officer from June 2020 to January 2023. Beginning in 2017, Mr. Renz held various positions of increasing responsibility at Correvio Pharma Corp, a specialty pharmaceutical company, most recently as its

President and Chief Financial Officer at the time of its acquisition by Advanz Pharma in May 2020. From 2014 to 2017, Mr. Renz was the Executive Vice President and Chief Financial Officer of Karyopharm Therapeutics, Inc. (Nasdaq: KTPI). Prior to that, from 2006 to 2014, Mr. Renz held a variety of financial positions with Zalicus Pharmaceuticals Ltd., a biopharmaceutical company, including most recently as Executive Vice President and Chief Financial Officer at the time of its acquisition by Epirus Biopharmaceuticals, Inc. in 2014. Mr. Renz received his B.A. in economics and accounting from the College of the Holy Cross, a M.S. in Taxation from Northeastern University and an M.B.A. from Suffolk University.

**Defendant Hohenleitner**

26. Defendant Hohenleitner has served as the Company's CFO since November 4, 2025.

27. The 2026 Proxy Statement stated the following about Defendant Hohenleitner:

**Susan Hohenleitner** has served as our Chief Financial Officer since November 2025. Prior to joining the Company, Ms. Hohenleitner held positions of increasing responsibility at Johnson & Johnson (NYSE: JNJ) from February 1997 to October 2025, where she led multiple finance organizations in areas such as supply chain, innovation, commercial, business development, investor relations, acquisitions and divestitures, and financial planning and analysis. In her most recent role as Vice President and Chief Financial Officer of J&J Innovative Medicine North America, Ms. Hohenleitner led a number of strategic initiatives that resulted in greater efficiencies, effectiveness and funding for growth. Ms. Hohenleitner is a Certified Public Accountant in the Commonwealth of Pennsylvania and a Certified Management Accountant. Previously, she was also a board member of the Institute of Management Accountants (IMA) where she provided oversight and strategy planning for the IMA and its members as well as the treasurer for the La Salle University Alumni Board. Ms. Hohenleitner earned a Bachelor of Science in Accounting from La Salle University and a Master of Business Administration from Villanova University.

**Defendant Foster**

28. Defendant Foster has served as the Company's Chief Commercial Officer from August 2024 to August 2026.

29. The 2026 Proxy Statement stated the following about Defendant Foster:

**Eric Foster** has served as our Chief Commercial Officer since August 2024. Before that, Mr. Foster served as Senior Vice President and U.S. General Manager at

Amgen (Nasdaq: AMGN), following the acquisition of Horizon Therapeutics (Nasdaq: HZNP) in October 2023, where he served as Senior Vice President and General Manager of the Gout and Ophthalmology Business Units from October 2022 until October 2023 and Group Vice President and General Manager of the Gout Business Unit from May 2021 until October 2022. Prior to his time at Horizon Therapeutics, from 2010 to 2021, Mr. Foster held roles of increasing responsibility within the sales and marketing organization at GlaxoSmithKline Plc (LSE/NYSE: GSK) across a variety of immunology and rare disease products, including serving as Vice President of Immunology Marketing, Senior Global Marketing Director and Field Sales Vice President. Mr. Foster began his career in sales and market access at Johnson & Johnson (NYSE: JNJ). Mr. Foster holds a Bachelor of Arts in Economics degree from the University of Georgia and a Master of Business Administration from Auburn University.

**Defendant Bazemore**

30. Defendant Bazemore has served as a Company director since June 2016. Defendant Bazemore currently serves as a member of the Compensation and Leadership Development Committee.

31. The 2026 Proxy Statement stated the following about Defendant Bazemore:

**Robert Bazemore**, age 58, has served on our board of directors since June 2016. Mr. Bazemore served as President and Chief Executive Officer and a director of Epizyme, Inc., a biopharmaceutical company, from September 2015 until the company was acquired by Ipsen S.A. (Euronext: IPN; ADR: IPSEY) in August 2022. Prior to joining Epizyme, Mr. Bazemore served as Chief Operating Officer of Synageva BioPharma Corp., a biopharmaceutical company, which was acquired by Alexion Pharmaceuticals, a pharmaceutical company and subsidiary of AstraZeneca Plc (NYSE: AZN), in July 2015. Prior to that, Mr. Bazemore was President of Janssen Biotech, part of the Janssen Pharmaceutical Companies of Johnson & Johnson (NYSE: JNJ). Mr. Bazemore currently serves on the board of directors of Nuvation Bio, Inc. (NYSE: NUVB) and Akari Therapeutics, PLC (Nasdaq: AKTX). Mr. Bazemore received his B.S. in Biochemistry from the University of Georgia. We believe that Mr. Bazemore is qualified to serve on our board of directors due to his significant life science industry experience, including as a chief executive officer, and service on the boards of directors of life sciences companies.

**Defendant Bertrand**

32. Defendant Bertrand has served as a Company director since October 2015. Defendant Bertrand currently serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit and Compliance Committee (the "Audit Committee").

33. The 2026 Proxy Statement stated the following about Defendant Bertrand:

> **William Bertrand, Jr., Esq.**, age 61, has served on our board of directors since October 2015. From March 2017 to November 2025, Mr. Bertrand served as the Chief Operating Officer at Adaptimmune Therapeutics Plc (Nasdaq: ADAP). From October 2015 to September 2016, Mr. Bertrand served as the Executive Vice President, General Counsel of Infinity Pharmaceuticals, Inc. (Nasdaq: INFI). From July 2013 to August 2015, Mr. Bertrand held a variety of positions with Salix Pharmaceuticals, Ltd., a biopharmaceutical company, including Senior Vice President, General Counsel, Acting Chief Operating Officer, and most recently, General Manager of Salix Pharmaceuticals following its acquisition by Valeant Pharmaceuticals International, now known as Bausch Health Companies Inc. (NYSE: VRX), in April 2015. Prior to that, Mr. Bertrand completed a 12-year career at MedImmune Limited, a biotechnology company and subsidiary of AstraZeneca Plc (NYSE: AZN), serving in numerous roles of increasing responsibility, including as Executive Vice President and General Counsel from 2008 to 2013. In December 2025, Mr. Bertrand joined the boards of directors of LevelBlue, a cybersecurity company, and Unplugged & Uncorked Inc., a wine distribution business. Mr. Bertrand received his B.S. in Biology from Wayne State University and his J.D. from the University of Wisconsin-Madison. We believe that Mr. Bertrand is qualified to serve on our board of directors due to his legal and compliance background and significant life science industry experience.

**<u>Defendant Bhanji</u>**

34. Defendant Bhanji has served as a Company director since March 2021. Defendant Bhanji currently serves as a member of the Nominating and Corporate Governance Committee.

35. The 2026 Proxy Statement stated the following about Defendant Bhanji:

> **Muna Bhanji, R.Ph**, age 63, has served on our board of directors since March 2021. Ms. Bhanji has served as the founder and principal of Tiba Global Access, LLC, an independent senior advisory practice focused on commercialization and market access strategy development, since January 2021. Ms. Bhanji previously served in roles of increasing responsibility at Merck & Co. (NYSE: MRK) between 1986 and January 2021, including as Senior Vice President, Global Market Access from 2010 until 2021 and as Senior Vice President, Hospital & Specialty Franchises from 2014 until 2017. Ms. Bhanji currently serves on the boards of directors of Veracyte, Inc. (Nasdaq: VCYT),

> Cytokinetics Incorporated (Nasdaq: CYTK), Intellia Therapeutics (Nasdaq: NTLA), Lumanity, a life sciences consulting firm, and Corus International, an international humanitarian organization committed to poverty alleviation. Ms. Bhanji also serves on the advisory group of Conquer AI, an artificial intelligence software company. Ms. Bhanji received her B.Sc. in Pharmacy from the Rutgers School of Pharmacy and her M.B.A. from Saint Joseph's University. We believe that Ms. Bhanji is qualified to serve on our board of directors due to her extensive U.S. and global commercial and operational experience within the pharmaceutical industry.

**<u>Defendant Cadoret-Manier</u>**

36. Defendant Cadoret-Manier has served as a Company director since March 2020. Defendant Cadoret-Manier currently serves as a member of the Compensation and Leadership Development Committee.

37. The 2026 Proxy Statement stated the following about Defendant Cadoret-Manier:

> **Onaiza Cadoret-Manier**, age 62, has served on our board of directors since March 2020. Ms. Cadoret-Manier has served as the Chief Executive Officer, President and Board Member of Yemaya Bio, a biotechnology company, since March 2024. From March 2022 to March 2024, Ms. Cadoret-Manier served as Chief Global Product Strategy and Operations Officer at Ionis Pharmaceuticals (Nasdaq: IONS), and from January 2020 to March 2022, Ms. Cadoret-Manier served as Chief Corporate Development and Commercial Officer at Ionis Pharmaceuticals. Prior to that, Ms. Cadoret-Manier was the Chief Commercial Officer for GRAIL, Inc. (Nasdaq: GRAL), an early detection genomics company, from June 2018 until June 2019. Prior to GRAIL, from April 2011 until June 2018, she was Vice President of the Respiratory Franchise at Genentech, Inc. , a biopharmaceutical company. Ms. Cadoret-Manier also has held multiple senior management positions overseeing corporate strategy, alliances, and marketing and sales for numerous disease areas for Genentech, Pfizer Inc. (NYSE: PFE) and Amylin Pharmaceuticals, all of which are biopharmaceutical companies. Ms. Cadoret-Manier served on the board of directors of Ventyx Biosciences from January 2023 until its acquisition by Eli Lilly and Company (NYSE: LLY) in March 2026. She has an M.B.A. from the University of Chicago and a bachelor's degree in economics and accounting from City University of New York Queens College. We believe that Ms. Cadoret-Manier is qualified to serve on our board of directors due to her extensive commercial and strategic operational experience with life sciences companies.

**<u>Defendant Mott</u>**

38. Defendant Mott has served as the Chairman of the Board since March 2014, and as a Company director since March 2009. Defendant Mott currently serves as the Chair of the Compensation and Leadership Development Committee and as a member of the Audit Committee.

39. The 2026 Proxy Statement stated the following about Defendant Mott:

> **David Mott**, age 60, has served on our board of directors since March 2009 and as the chairperson of the board of directors since March 2014. Mr. Mott is currently Chief Executive Officer and Chief Investment Officer of Sphinx Mountain Capital LLC, a family office investment business, and, from February 2020 through August 2025, was a private investor through Mott Family Capital. From 2008 to 2020, Mr. Mott was a general partner of New Enterprise Associates, one of the world's largest venture capital firms, which invests in companies across all stages in healthcare and technology. At NEA, Mr. Mott led the healthcare investing practice with a personal focus within biotechnology. Mr. Mott served as President and Chief Executive Officer and Vice Chairman of MedImmune Limited from 2000 through 2008, during which he led the sale of the company to AstraZeneca Plc (NYSE: AZN) in June 2007 for $15.6 billion. He joined MedImmune in 1992 and, prior to becoming Chief Executive Officer in 2000, served in various senior roles, including Chief Operating Officer, Chief Financial Officer, and Head of Business Development and Strategy. Mr. Mott currently serves as the chairperson of the board of directors for Novavax, Inc. (Nasdaq: NVAX) and is a member of several non-profit organizations. Mr. Mott holds a Bachelor of Arts degree from Dartmouth College. We believe that Mr. Mott is qualified to serve on our board of directors due to his extensive experience in the life sciences industry as a senior executive, his investment experience, strategic leadership track record and service on other boards of directors of life sciences companies.

**<u>Defendant Parsey</u>**

40. Defendant Parsey has served as a Company director since April 2025. Defendant Parsey currently serves as a member of the Nominating and Corporate Governance Committee.

41. The 2026 Proxy Statement stated the following about Defendant Parsey:

> **Merdad Parsey, M.D., Ph.D.**, age 63, has served as a member of our board of directors since April 2025. Dr. Parsey served as the Chief Medical Officer of Gilead Sciences, Inc. (Nasdaq: GILD) from November 2019 until April 2025. From October 2015 to November 2019, Dr. Parsey served as Senior Vice President of early clinical development at Genentech, Inc., a biopharmaceutical company Prior to Genentech, Dr. Parsey served as President and Chief Executive Officer of 3-V Biosciences Inc. (now Sagimet BioSciences Inc. (Nasdaq: SGMT)), held development roles at Sepracor Inc., Regeneron Pharmaceuticals, Inc., and Merck

> & Co., Inc., each a pharmaceutical company, and was Assistant Professor of Medicine and Director of Critical Care Medicine at the New York University School of Medicine. He currently serves on the board of directors for Arrivent Biopharma (Nasdaq: AVBP). Additionally, Dr. Parsey previously served on the boards of directors of Sagimet Biosciences (Nasdaq: SGMT) Arcus Biosciences, Inc. (NYSE: RCUS) and the Gilead Foundation, a nonprofit organization focused on health equity. Dr. Parsey received his B.S. in microbiology and biochemistry from the University of Maryland and his M.D. and Ph.D. in immunology from the University of Maryland at Baltimore. He completed his internal medicine residency at Stanford University and his pulmonary and critical care fellowship at the University of Colorado. We believe Dr. Parsey is well-suited to serve on our board of directors due to his years of experience in clinical drug development and his extensive scientific and medical experience.

**Defendant Rodgers**

42. Defendant Rodgers has served as a Company director since March 2014. Defendant Rodgers currently serves as the Chair of the Audit Committee and as a member of the Compensation and Leadership Development Committee.

43. The 2026 Proxy Statement stated the following about Defendant Rodgers:

> **Richard Rodgers**, age 59, has served on our board of directors since March 2014. From March 2010 until August 2013, Mr. Rodgers was co-founder, Executive Vice President, Chief Financial Officer, Secretary and Treasurer of Tesaro, Inc., a biopharmaceutical company, which was acquired by GlaxoSmithKline plc (LSE/NYSE: GSK) in January 2019. Mr. Rodgers previously served as the Chief Financial Officer of Abraxis BioScience, Inc., a biotechnology company, from June 2009 to February 2010. Prior to that, Mr. Rodgers served as Senior Vice President, Controller and Chief Accounting Officer of MGI PHARMA, Inc., a biopharmaceutical company, from 2004 until its acquisition by Eisai Co. Ltd. (OTC: ESALF) in January 2008. Mr. Rodgers has held finance and accounting positions at several private and public companies, including Arthur Andersen & Co. Mr. Rodgers currently serves as a director of Novavax, Inc. (Nasdaq: NVAX) and Opus Genetics, Inc. (Nasdaq: IRD). Mr. Rodgers received a B.S. in Financial Accounting from St. Cloud State University and his M.B.A. in Finance from the University of Minnesota, Carlson School of Business. We believe that Mr. Rodgers is qualified to serve on our board of directors due to his financial background, significant industry experience, and service on other boards of directors of publicly-traded life sciences companies.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

44. By reason of their positions as officers and/or directors of Ardelyx and because of their ability to control the business and corporate affairs of Ardelyx, the Individual Defendants owed Ardelyx and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Ardelyx in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Ardelyx and its shareholders so as to benefit all shareholders equally.

45. Each director and officer of the Company owes to Ardelyx and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

46. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Ardelyx, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

47. To discharge their duties, the officers and directors of Ardelyx were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

48. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Ardelyx, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the

Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Ardelyx's Board at all relevant times.

49. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

50. To discharge their duties, the officers and directors of Ardelyx were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Ardelyx were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Massachusetts, and the United States, and pursuant to Ardelyx's own Code of Business Conduct and Ethics (the "Code of Ethics");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Ardelyx conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Ardelyx and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Ardelyx's operations would comply with all applicable laws and Ardelyx's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

51. Each of the Individual Defendants further owed to Ardelyx and the shareholders the duty of loyalty requiring that each favor Ardelyx's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

52. At all times relevant hereto, the Individual Defendants were the agents of each other and of Ardelyx and were at all times acting within the course and scope of such agency.

53. Because of their advisory, executive, managerial, and directorial positions with Ardelyx, each of the Individual Defendants had access to adverse, non-public information about the Company.

54. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Ardelyx.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

55. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

56. The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

57. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material

facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Ardelyx was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

58. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

59. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Ardelyx and was at all times acting within the course and scope of such agency.

## ARDELYX'S CODE OF ETHICS

60. The Company's Code of Ethics states that it "contains the general guidelines for conducting the business of Ardelyx, Inc. [] consistent with the highest standards of business ethics." The Code of Ethics notes that it "applies to all of our directors, officers and other employees."

61. In the section titled "Reporting Violations of the Code," the Code of Ethics provides the following:

> All employees and directors have a duty to report any known or suspected violation of this Code, including violations of the laws, rules, regulations or policies that

> apply to the Company. If you know of or believe there has been a violation of this Code, immediately report the conduct to your supervisor. The Company's General Counsel or Principal Financial Officer will work with you and your supervisor or other appropriate persons to investigate your concern. If you do not feel comfortable reporting the conduct to your supervisor or you do not get a satisfactory response, you may contact the Company's General Counsel or Principal Financial Officer directly. You may also report known or suspected violations by voicemail at 877-4411591 or through a website at www.openboard.info/ARDX. You may remain anonymous and will not be required to reveal your identity, although providing your identity may assist the Company in investigating your concern. All reports of known or suspected violations of the law or this Code will be handled sensitively and with discretion. Your supervisor, the Company's General Counsel or Principal Financial Officer, as applicable, and the Company will protect your confidentiality to the extent possible, consistent with applicable law and the Company's need to investigate your concern.
>
> It is Company policy that any employee or director who violates this Code, or who directs or approves a violation of this Code, may be subject to appropriate discipline, which may include termination of employment or removal from the Board of Directors, as appropriate. This determination will be based upon the facts and circumstances of each particular situation. If you are accused of violating this Code you will be given an opportunity to present your version of the events at issue prior to any determination of appropriate discipline. Employees and directors who violate the law or this Code may expose themselves to substantial civil damages, criminal fines and prison terms. The Company may also face substantial fines and penalties and may incur damage to its reputation and standing in the community. Your conduct as a representative of the Company, if it does not comply with the law or with this Code, can result in serious consequences for both you and the Company.

62. In the section titled "Waivers of the Code," the Code of Ethics states the following:

> Any waiver of this Code for our directors, executive officers or other principal financial officers may be made only by our Board of Directors and will be disclosed to the public as required by law or the rules of The Nasdaq Global Stock Market. Waivers of this Code for other employees may be made only by the Company's Chief Executive Officer, General Counsel or Principal Financial Officer and will be reported to our Audit Committee.

63. In a section titled "Conflicts of Interest," the Code of Ethics states the following, in relevant part:

> **Identifying Potential Conflicts of Interest**

> A conflict of interest can occur when an employee's or director's private interest interferes, or appears to interfere, with the interests of the Company as a whole. You should avoid any private interest that influences your ability to act in the interests of the Company or that makes it difficult to perform your work objectively and effectively.
>
> ***
>
> Conflict of interest issues concerning the Company's directors will be addressed by the Company's Audit Committee.
>
> **Disclosure of Conflicts of Interest**
>
> The Company requires that employees and directors disclose any situation that reasonably would be expected to give rise to a conflict of interest. If you reasonably believe that you have a conflict of interest, or something that others would reasonably perceive as a conflict of interest, you must report it in writing to your supervisor or the Company's General Counsel or Principal Financial Officer. Your supervisor and the Company's General Counsel or Principal Financial Officer will work with you to determine whether you have a conflict of interest and, if so, how best to address it. Although conflicts of interest are not automatically prohibited, they are not desirable and may only be waived as described in "Waivers of the Code" above.

(Emphasis in Original).

64. In a section titled "Company Records," the Code of Ethics states the following:

> Accurate and reliable records are crucial to our business. Our records are the basis of our earnings statements, financial reports and many other aspects of our business and guide our business decision-making and strategic planning. Company records include booking information, payroll, timecards, travel and expense reports, e-mails, accounting and financial data, measurement and performance records, electronic data files, personnel records, records relating to our intellectual property, product development and collaborations and all other records maintained in the ordinary course of our business.
>
> All Company records must be complete, accurate and reliable in all material respects. Each employee and director must follow any formal document retention policy of the Company with respect to Company records within such employee's or director's control. A request for a copy of any such document retention policy or questions concerning any such policy should be directed to your supervisor, or the Company's General Counsel or Principal Financial Officer.

65. In a section titled "Accuracy of Financial Reports and Other Public Communications," the Code of Ethics states the following:

> As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.
>
> The Company's Principal Financial Officer and other employees working in the Finance Department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

66. In a section titled "Compliance with Laws and Regulations," the Code of Ethics states the following:

> Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position. If any doubt exists about whether a course of action is lawful, you should seek advice from your supervisor or the Company's General Counsel or Principal Financial Officer.

67. In a section titled "Compliance with Insider Trading Laws," the Code of Ethics states the following:

> Company employees and directors are prohibited from trading in the Company's stock or other securities while in possession of material, non-public information about the Company or its subsidiaries. In addition, Company employees and directors are prohibited from recommending, "tipping" or suggesting that anyone else buy or sell the Company's stock or other securities on the basis of material, nonpublic information. Employees and directors who obtain material nonpublic information about another company in the course of their duties are prohibited from trading in the stock or securities of that other company while in possession of such

> information or "tipping" others to trade on the basis of such information. Violation of insider trading laws can result in severe fines and criminal penalties, as well as disciplinary action by the Company, up to and including termination of employment. You are required to read carefully and observe our Insider Trading Compliance Program, as amended from time to time. Please inform your supervisor or the General Counsel if you do not have a copy of our Insider Trading Compliance Program.

68. In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. Moreover, one of the Individual Defendants violated the Code of Ethics by engaging in insider trading, netting proceeds of approximately $1.7 million. Also, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Company records and reports, maintain internal controls, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics and law.

## ARDELYX'S AUDIT COMMITTEE CHARTER

69. The Company also maintains an Audit and Compliance Committee Charter (the "Audit Committee Charter"). The Audit Committee Charter states the following regarding the purpose of the Audit Committee:

> The Committee shall assist the Board in overseeing the accounting and financial reporting processes of the Company, the audits of the financial statements of the Company, the Company's compliance with legal and regulatory requirements, oversight of the Company's compliance program, and the qualifications, independence and performance of the Company's registered public accounting firm. The Committee shall have the appropriate resources and authority to conduct or authorize investigations into any matters within the scope of the powers and responsibilities delegated to the Committee and may exercise any other powers and carry out any other responsibilities delegated to it by the Board consistent with the Company's Amended and Restated By-Laws ("By-Laws"). The Committee shall

> have full access to all books, records, facilities and personnel of the Company to conduct such investigations. The Committee shall be entitled to delegate any or all of its responsibilities to a subcommittee of the Committee, to the extent consistent with the Company's Amended and Restated Certificate of Incorporation ("Company Charter"), By-Laws and applicable laws, regulations and Nasdaq Stock Market LLC ("Nasdaq") rules.

70. In the section titled "Responsibilities and Processes," under the heading "Recurring Processes and Responsibilities," the Audit Committee Charter notes the following responsibilities of the Audit Committee:

> The following shall be the principal recurring processes of the Committee in carrying out its oversight responsibilities. The processes are set forth as a guide with the understanding that the Committee may supplement them as appropriate.
>
> ***
>
> ***Audits, Financial Statements and Disclosures***
>
> - In connection with each annual audit, the Committee shall discuss with management and the Company's registered public accounting firm the overall scope and plan for the annual audit, the procedures to be followed and the staffing of the audit. In addition, the Committee shall discuss with management and the Company's registered public accounting firm, the adequacy and effectiveness of the accounting and financial controls and procedures.
>
> - The Committee shall review with management and the Company's registered public accounting firm the audited financial statements (including management's discussion and analysis contained therein) to be included in the Company's Annual Report on Form 10-K, including its judgment as to the quality, and not only the acceptability, of accounting principles, the reasonableness of significant judgments and the clarity of the disclosures in the financial statements. The Committee shall review with the firm any problems or difficulties encountered during the audit work, including any restrictions on the scope of activities or access to required information or any significant disagreements with management and management's responses to such matters. Among the items that the Committee should consider reviewing with the firm are: (i) any accounting adjustments that were noted or proposed by the auditor but were "passed" (as immaterial or otherwise); (ii) any communications between the audit team and the independent auditor's national office respecting auditing or accounting issues presented by the engagement; and (iii) any "management" or "internal control" letter issued, or proposed to

be issued, by the independent auditor to the Company. The Committee shall obtain from the independent auditor assurances that the independent auditor has provided all notices of illegal acts as required by Section 10A(b) of the Exchange Act.

- The Committee shall discuss with the independent auditor the report that such auditor is required to make to the Committee regarding: (i) all accounting policies and practices to be used that the independent auditor identifies as critical; (ii) all alternative treatments within GAAP for policies and practices related to material items that have been discussed among management and the independent auditor, including the ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and (iii) all other material written communications between the independent auditor and management of the Company, such as any management letter, management representation letter, reports on observations and recommendations on internal controls, independent auditor's engagement letter, independent auditor's independence letter, schedule of unadjusted audit differences and a listing of adjustments and reclassifications not recorded, if any. In connection with any annual management letter discussing the Company's internal controls issued or proposed to be issued by the independent auditor, the Committee shall receive, review and discuss with the independent auditor and, if appropriate, management, such draft management letter and management's response, if any. • The Committee also shall discuss with the registered public accounting firm the results of the annual audit and any other matters required to be communicated to the Committee by the Company's registered public accounting firm under generally accepted accounting principles, by PCAOB Auditing Standard No, 1301, Communications with Audit Committees, and any other applicable requirements of PCAOB. Based on the foregoing and on review of other information made available to the Committee, the Committee shall recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K. In addition, the Committee shall prepare annually a report to the stockholders of the Company, as required by the rules of the Commission.

- The Committee shall similarly review the Company's interim financial statements with management and the Company's registered public accounting firm prior to the filing of each of the Company's Quarterly Reports on Form 10-Q. The Committee shall discuss the results of the quarterly review and any other matters required to be communicated to the Committee by the Company's registered public accounting firm under generally accepted accounting standards.

71. In the same section, under the heading "Compliance Matters," the Audit Committee Charter notes the following responsibilities of the Audit Committee:

> The Committee shall have oversight of the Company's compliance program and shall ensure the Chief Compliance Officer has sufficient independence, access and resources to encourage ethical conduct and compliance with laws and regulations.
>
> - The Committee shall meet regularly with the Chief Compliance Officer and receive reports from the Chief Compliance Officer regarding the structure and activities of the Company's Compliance program, including updates on training, policies, auditing and monitoring, investigations and any corrective and preventative actions. The Committee may also meet separately with the Chief Compliance Officer to discuss any matters that the Committee or the Chief Compliance Officer believes should be discussed privately. The Committee shall provide such guidance and support as the Chief Compliance Officer may request from time to time.
>
> - The Committee shall oversee the establishment and maintenance of procedures for the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls and auditing matters, the submission by employees of the Company of concerns regarding questionable accounting or auditing matters, violation of the Company's code of conduct or other Company policies, and any other compliance and legal violations. Material (non-administrative) complaints received directly by the General Counsel or Chief Compliance Officer through such procedures shall be reported to the Committee by the General Counsel or Chief Compliance Officer.
>
> - In the event the Committee is made aware of any allegation of fraud relating to the Company and/or any of its officers, directors or employees that the Committee determines could be material to the Company's business or operations, the Committee shall (i) convene a meeting of the Committee to review such allegation and (ii) if the Committee deems it necessary or advisable, it shall engage outside legal counsel to assist in an investigation, including, if the Committee and such counsel deem it necessary or advisable, an investigation to determine whether such allegation implicates any violation of Section 10A of the Exchange Act or any other US or international law. If pursuant to such investigation the Committee discovers that a material fraud has occurred, the Committee shall (i) assess the Company's internal controls and Compliance policies and implement such remedial measures as it determines necessary or advisable, (ii) take appropriate action against the perpetrator(s) of such fraud and (iii) cause the Company to make appropriate disclosures relating to the matter in the Company's periodic reports filed with the SEC or otherwise.

- The Committee shall also be designated as the committee of the Board of Directors that shall receive, review and take action with respect to any reports by attorneys, pursuant to Section 307 of the Sarbanes-Oxley Act of 2002, of evidence of material violations of securities laws or breaches of fiduciary duty or similar violations by the Company or one of its agents.

72. In the same section, under the heading "Other Risk Management Matters," the Audit Committee Charter notes the following responsibilities of the Audit Committee:

- The Committee shall maintain a strategic role in coordinating cyber risk initiatives and policies, and confirming their efficacy. These responsibilities include setting expectations and accountability for management, as well as assessing the adequacy of resources, funding and focus for cybersecurity activities. The Committee shall periodically review the Company's cybersecurity program.

- The review and approval of the Committee shall be required prior to the Company entering into any transactions with a related party, consistent with the Company's Related Party Transaction Policy and Procedures (as may be modified from time to time).

- The Committee shall also provide oversight and guidance as requested by management in connection with risk mitigation efforts such as preparation of earnings press releases, disclosure of financial information to analysts and rating agencies, correspondence with regulators or governmental agencies, compliance with legal and audit requirements for Company sponsored retirement plans, and review of the Company's investment policy.

- The Committee shall, periodically, and with input from the Nom and Gov Committee, provide a self-assessment of the performance of the Committee and its members, including a review of the Committee's compliance with this Charter, and provide a report with respect to such self-assessment to the Board or the Nom and Gov Committee, as appropriate, including any recommendations for changes in procedures or policies governing the Committee.

- The Committee shall annually review and assess internal controls and treasury functions including cash management procedures.

73. The Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the Company to engage in issuing materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law, including breaches of

fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

74. Ardelyx is a Massachusetts-based biopharmaceutical company which develops and markets medications intended to satisfy untapped medical demand. To this end, the Company markets two primary therapies derived from the active ingredient Tenapanor, IBSRELA and XPHOZAH.

75. Tenapanor is a sodium/hydrogen exchanger ("NHE3") inhibitor which was discovered and developed by the Company. NHE3 acts as an antiporter, or a membrane protein which moves ions in the body across a phospholipid membrane, on the apical (outer facing) surface of the small and large intestines. IBSRELA is approved in the United States for the treatment of adults with irritable bowel syndrome with constipation, and the Company is in the process of expanding its use to treat chronic idiopathic constipation. The Company first recognized sales of IBSRELA in March 2022.

76. XPHOZAH is approved in the United States to assist adults with chronic kidney disease on dialysis by reducing levels of serum phosphorus, since elevated levels of serum

phosphorus may result in severe cardiovascular health complications. XPHOZAH was approved by the United States Food and Drug Administration in October 2023.

77. As of December 31, 2025, the Company employed 489 individuals full-time, 305 of whom were engaged in sales and marketing, 93 of whom were engaged in direct research, and 91 of whom were engaged in general and administrative activities. In 2025, the Company recorded $274.2 million in revenue deriving from IBSRELA, and $103.6 million in revenue deriving from XPHOZAH.

78. The Company has noted that the commercial success of its products, namely IBSRELA and XPHOZAH, depend in large part on the continued reimbursement of the drugs through healthcare plans such as Medicare. For instance, the policy changes in Medicare reimbursement coverage in early 2025 resulted in a materially negative impact on the Company's XPHOZAH revenue in 2025. Another factor which materially impacts the commercial viability of IBSRELA and XPHOZAH are barriers to prior-authorization. Prior-authorization refers to the approval required from an individual's health insurance company before the insurance company will pay for the particular medication.

79. In particular, some of the specific forms of prior authorization which negatively impacts the commercial viability of IBSRELA and XPHOZAH are known as "Step-Edits." Through Step-Edits, an individual's health insurance company will require the patient to attempt lower-costing medications before approving the originally intended prescription.

80. On August 4, 2025, the Company filed a Current Report on Form 8-K with the SEC which announced that Defendant Renz would "transition out of the role" of Chief Financial and Operations Officer upon the earlier of: (1) December 31, 2025; or (2) the date which was thirty calendar days following the start date of the Company's new CFO.

81. On August 17, 2026, the Company filed a Current Report on Form 8-K with the SEC which announced that Defendant Foster was resigning as the Company's CCO effective August 28, 2026.

**False and Misleading Statements**

***January 13, 2025 Press Release***

82. On January 13, 2025, the Company issued a press release titled "Ardelyx Provides Update on Increasing Commercial Momentum and 2025 Strategic Priorities" (the "January 2025 Press Release"). The January 2025 Press Release announced "significant commercial progress in 2024," including roughly $319 million in U.S. net product sales. The January 2025 Press Release further reported expected peak U.S. annual sales of $750 million for XPHOZAH, and restated U.S. annual sales of more than $1 billion for IBSRELA.

83. The January 2025 Press Release stated the following concerning the potential performance of IBSRELA and XPHOZAH, in relevant part:

> As you saw in the performance during the fourth quarter, the team is delivering on the promise of IBSRELA. ***This performance reaffirms our expectation that IBSRELA can achieve greater than $1 billion in annual sales at peak***. In 2024, XPHOZAH's performance demonstrated its critical role in the treatment of hyperphosphatemia where there continues to be a high unmet need among patients. ***It is evident that there is a significant opportunity for XPHOZAH and we expect this product will achieve $750 million in annual sales at peak***.

84. The January 2025 Press Release quoted Defendant Raab touting the Company's 2025 financial prospects, stating in relevant part:

> ***In 2025, we will be focused on our strategic priorities: Maintaining our growth momentum, building a pipeline and delivering a strong financial performance. We remain steadfast in our commitment to operational excellence and to making decisions in the best interest of patients and our shareholders***.

***January 15, 2025 43rd Annual J.P. Morgan Healthcare Conference***

85. On January 15, 2025, Defendants Raab and Foster represented the Company at the 43rd Annual J.P. Morgan Healthcare Conference (the "J.P. Morgan Conference"). During the J.P. Morgan Conference, Defendant Raab touted the Company's financial performance and patient-services infrastructure investments, stating the following in relevant part:

> We have an extremely strong financial foundation with $250 million on the balance sheet. ***And we're in the process of beginning business development opportunities as we begin to look to build a pipeline and build sustainable enterprise***. That is our objective and maintain the commercial momentum that we have created for the company.
>
> ***
>
> ***And we'll continue investing, which is a critical component of what we do at Ardelyx is our patient services group, ArdelyxAssist, where -- what is so critical about that and I think often underlooked, is our sales organization, our ABDs, drive the top of the funnel and demand. And pulling those prescriptions through that and then ultimately ensuring that they are fulfilled for the patient is something you take for granted***, but it's a critically important thing in today's world, particularly with a drug like IBSRELA, where we do go through a prior authorization. We're not a first-line therapy intentionally because the strategy was to take advantage of this incredible mechanism and help those patients that are not well served with the current therapies.
>
> ***So from that enthusiasm that we see, the benefit that we saw in the revenue in last year, we reaffirmed our guidance that we see this easily being $1 billion product or more before patent expiry***. So that's an exciting thing for us. And that's only a 10% penetration in that market that I showed early on of over 6.3 million prescriptions, penetrating 10% of that market with the benefit that we demonstrate is certainly achievable.
>
> ***So this is what we look at, right, $240 million to $250 million was also the guidance that we provided for IBSRELA in the coming -- in this year. That's 52% annual growth over 2024***. So again, if you look at where we were with $158 million going to $250 million, we're on a trajectory that you can clearly see that achieves that $1 billion opportunity in revenue for Ardelyx and our shareholders.
>
> ***
>
> XPHOZAH is demonstrating, in this first year, the ability for patients even to be able to eat better. We have patients that anecdotally are now able to get transplants that previously were unable to. ***So there's something important that's happening with XPHOZAH, and that's why we have such enthusiasm about where we are***.

***

> ***What I really want everyone to do going forward is that has happened, and what we focus on is the patients that are available not within the Medicare system, so it's non-Medicare patients, it's about 220,000 patients.***
>
> ***As you focus on that, those 220,000 patients, as we came out in our guidance, is going to generate up to $750 million.***

86. During the question-and-answer portion of the J.P. Morgan Conference, Defendants Raab and Foster responded to several analyst questions concerning the expansion of the Company's sales force and patient access to prescriptions, in the following pertinent exchanges:

> [Q: Ben Davis– J.P. Morgan– Associate] In the fourth quarter, IBSRELA grew 30% compared to the third quarter. What was driving this growth?
>
> [A: Defendant Foster] Fourth quarter was a great quarter, more than 30% growth quarter-over-quarter from Q3. ***We completed our sales force expansion at the end of Q3, and they were trained and in the field for all of Q4. So we certainly saw an inflection point there.***
>
> ***We're excited about the exit trajectory coming into 2025.*** It's not just about driving the top of the funnel, but you also have to pull those patients through. ***We've got a great hub and patient services program with ArdelyxAssist, and it performed phenomenally in the fourth quarter. So driving patients at the top of the funnel, pulling those patients through to the bottom of the funnel so more patients can have access to IBSRELA.***
>
> [Q: Ben Davis– J.P. Morgan– Associate] You provided IBSRELA guidance for 2025 of $240 million to $250 million and reiterated the peak sales of $1 billion. What do you see as some of the next steps required to reach those numbers?
>
> [A: Defendant Foster] Yes. So the sales force is focused on driving clinical conviction and patient identification. So in 2025, we're expanding our field access manager team. ***So this is a field-based team, part of our ArdelyxAssist that's really focused on the pull-through. So when you think about the drivers that we have moving forward, not only do we have an increased number of sales reps, and that's important because we've been able to expand the reach and the total number of targets that we're focused on.*** So not only are we focused on highwriting GIs, but we've been able to expand the number of APPs, advanced practice providers, nurse practitioners and PAs, as well as expand the number of

highwriting non-GIs that the sales team can focus on. And that's really where we saw that growth in terms of new writers in Q4.

***But expanding the field team that's going to be able to focus on pulling through those patients is equally as critical as driving at the top of the funnel. So this team will work with physicians' offices on pulling through the prior authorizations and making sure that the patients can have access to the product***.

[Q: Ben Davis– J.P. Morgan– Associate] So another question now thinking about XPHOZAH a bit more. You talked through a bit of the numbers behind the launch. I was wondering if you could talk about what were some of the drivers behind it?

[A: Defendant Raab] So for us, that is what drives us is that, that incredible need. ***The fact that we then also have its prior authorization, so what Eric described in terms of ArdelyxAssist and how we facilitate the prior authorization program so that you, Ben, if you were the physician, you write a script now last year or now within the bundled payment system that's affecting so many patients, we don't want you to worry about whether I or any other patient actually gets the script***.

We have, within our patient services program, that we tell you the physician who writes the script, we will adjudicate. We'll figure out whether or not it's Medicare or not. And if it's not, the likelihood of getting coverage is high. If it's not -- if it's Medicare, then you will be put into the patient assistance program. If you qualify, you will get the drug for free. And most people will qualify.

***So it's a really critical part of what it is that we're doing***. We don't want the physician to be concerned because of what we've talked about the need and how imperative it is the patients get their phosphorus managed. We don't want that to be a concern. ***So we'll take care of that on the back end. So you, the physician, never hears whether or not a patient has actually access the drug that you prescribed***.

***February 20, 2025 Financial Reports***

87. On February 20, 2025, the Company issued a press release to announce its financial results for the fourth quarter and full year 2024 (the "Q4 2024 Press Release"). The Q4 2024 Press Release noted "combined peak sales of IBSRELA and XPHOZAH of $1.75 Billion," and stated the following, in relevant part:

**IBSRELA® (tenapanor) finishes 2024 with $158.3 million in net product sales revenue**
U.S. net product sales revenue for IBSRELA in 2024 was $158.3 million, including $53.8 million in net product sales revenue in the fourth quarter, approximately 32% growth compared to the third quarter of 2024. Ardelyx currently expects full year

> 2025 U.S. net product sales revenue for IBSRELA to be between $240 and $250 million. Ardelyx continues to expect IBSRELA to achieve greater than ten percent market share at peak and generate more than $1 billion in annual U.S. net product sales revenue before patent term expiration.
>
> **XPHOZAH® (tenapanor) records $160.9 million net product sales revenue in first full year of commercialization**
> U.S. net product sales revenue for the first full calendar year of commercialization of XPHOZAH was $160.9 million, including $57.2 million in net product sales revenue during the fourth quarter of 2024. At peak, Ardelyx currently expects XPHOZAH to achieve $750 million in annual U.S. net product sales revenue before patent term expiration.
>
> (Emphases in original).

88. The Q4 2024 Press Release quoted Defendant Raab as touting the Company's "position of strength" in 2025, including IBSRELA's substantial revenue growth in 2024, XPHOZAH's successful first year of sales, and the Ardelyx's "strong cash position to support future growth opportunities."

89. That same day, the Company hosted the Q4 2024 Earnings Call. During the Q4 2024 Earnings Call, Defendant Raab noted that the Company was "confidently tackling the challenging reimbursement environment" and emphasized the growth prospects of IBSRELA and XPHOZAH, stating the following, in relevant part:

> ***IBSRELA's growth continued throughout 2024 with an acceleration in the fourth quarter as we began to see the positive impact of our expanded sales team***. It is evident that patients are benefiting from IBSRELA as this important medication provides rapid and lasting relief from the symptoms of IBS-C, which can significantly disrupt patients' lives.
>
> ***For XPHOZAH, our team successfully executed one of the best product launches in recent years***. In the first year of sales, we demonstrated that XPHOZAH is a crucial medication for dialysis patients, enabling them to achieve and maintain target phosphorus levels.
>
> ***In the midst of this outstanding performance, we confidently tackled the challenging reimbursement environment. Our commitment to prioritizing patient needs has never wavered. We've taken strong decisive actions and we're dedicated***

> ***to ensuring that patients continue to have access to XPHOZAH as they always have regardless of the coverage changes made by CMS***.
>
> Our commitment to protecting patient access guarantees that at a minimum, we will continue to serve dialysis patients as we aim to grow the XPHOZAH business to at least $750 million before patent expiry.

90. Moreover, Defendant Foster discussed the Company's prior authorization barrier-related investments and XPHOZAH's growth prospects, stating, in relevant part:

> Today, XPHOZAH is available, as it always has been, as a prescription written by a health care provider. The only thing that has changed is that XPHOZAH is no longer covered by Medicare Part D.
>
> Second, our commercial approach is unchanged from last year. ***As with IBSRELA, our XPHOZAH team is focused on driving clinical conviction and patient identification and pulling prescriptions through to the patient***.
>
> ***At the same time, they're helping the nephrology community and care teams to understand that their ability to prescribe XPHOZAH remains unchanged and that for the best experience, prescriptions should be sent to the ArdelyxAssist specialty pharmacy***.
>
> Most importantly, we do not want physicians to change their prescribing habits based on patient coverage. Our message is to prescribe as you always have, based on the patient need and we will adjudicate patient access and affordability on our end. That directive will ultimately support our long-term growth expectations.
>
> For us, ensuring patients have access to therapies is both a moral obligation and a strategic opportunity. ***We have seen the benefit that XPHOZAH offers and we are fortunate that the business we've structured and the approach that we have taken XPHOZAH will achieve $750 million in annual net sales revenue prior to patent expiry***. As I think we have demonstrated in the past, ***we provide guidance that is thoughtful and reflects our expectations of the business allows us to ensure access to our medicines regardless of payer. With this approach, we are confident that we can deliver significant growth on our path to $750 million at peak***.

91. Also during the Q4 2024 Earnings Call, Defendant Renz stated that Ardelyx anticipated "that XPHOZAH will achieve $750 million in annual net sales revenue prior to patent expiry. As I think we have demonstrated in the past, we provide guidance that is thoughtful and reflects our expectations of the business."

92. Further, during the question-and-answer segment of the earnings call, Defendants Raab and Foster asserted the viability of patient access to XPHOZAH and its access strategy overall, in the following pertinent exchanges with analysts:

> [Q: Yuchen Ding – Jefferies LLC – Equity Analyst] We have one on XPHOZAH and another follow-up on IBSRELA. So for XPHOZAH, thanks for your comments in the prepared remarks. It's very encouraging to hear. So we're seeing scripts potentially bottoming out, but curious what you're seeing real-time in the field now that we're towards the end of February and if doctors are broadly prescribing XPHOZAH in the same way as they did in 2024. I guess the key question is from a volume perspective, do you think we are at the bottom?
>
> [A: Defendant Foster] I mean, I think it is too early to say whether or not we've been at the bottom. What I can say is our message has certainly been well received with regards to access continuing for XPHOZAH for these patients.
>
> ***And again, it was really important that we make sure that we were confident that the plan that we have and those 4 patient groups and pathways that they were being able to kind of flow through and receive access. And very early on, we saw that those 4 patient paths, they were successful and that patients were able to have access***.
>
> ***So we're continuing to see that as we saw from the beginning part of this quarter. And we just continue to be encouraged that we're continuing to see that flow through***. As Mike said, there is a lot of activity right now with regards to the binders being in the bundles and the DOs having to work through that.
>
> So we're certainly empathetic to the challenges that they're going through and we just continue to remain focused on ourselves and making sure that physicians are confident that there continues to be access for XPHOZAH and those patients out there in need can have access to it. So we're encouraged by seeing that and we're just going to continue to push forward from there.
>
> ***
>
> [Q: Roanna Clarissa H. Ruiz – Leerink Partners LLC – Senior Research Analyst] So quick one on XPHOZAH. Given the new reimbursement dynamic, I was curious what factors could allow you to meet or even exceed the $750 million peak sales guide for this product? And also I wanted to know if you could elaborate a bit more on some of the strategies and resources you're using to make sure Medicare patients continue to stay on XPHOZAH therapy if they qualify.

[A: Defendant Foster] Yes. So we -- ***as we think about for the patient's journey, we're very proud of our ArdelyxAssist team and the service that they're able to provide for physicians and for patients out there***.

***And that's one of the reasons why we've decided to expand that to be more of a field-facing team in 2025***. So we think about the levers for us, again, it's very simple messaging that we continue to have access regardless of payer coverage or patients continue to have access regardless of payer coverage.

***We continue to make sure that we've got a solid marketing plan***. We're out there with physicians. We're in the community, peer-to-peer programming, meeting them at conferences where we know that they like to receive information and they like to engage with the teams.

***And then again, the ArdelyxAssist to be able to work with the offices to help triage those patients as they work through their journey to be able to have access***. And we're confident that, that works and we're seeing a lot of traction there and access is flowing through in 2025.

***So that's what's really giving us the confidence that we'll be able to achieve that***, whether it's having access in the non-Medicare segments and then also patients being able to qualify for a patient assistance program if they're Medicare patients.

***

[Q: Julian Reed Harrison – BTIG, LLC – Analyst] On XPHOZAH…curious if private payer access is where you want it to be for 2025? Or maybe there's some near-term opportunities to grow the coverage on that side?

[A: Defendant Raab] So that -- those are the 5 pillars of non-Medicare. ***In terms of expanding access on the commercial side, remember, Julian, that we don't have rebates, we don't have discounts and that's why we've embraced the prior auth process***. So any specificity around expanding that is certainly something that we would always consider, but don't see that as a strategy in the short term. Eric, anything you'd add to that?

[A: Defendant Foster] I would just say, ***I mean, to your point, following on from a prior authorization standpoint, the PA approval rate is very high. And I think you can see that with the uptake that we had in 2024 and certainly reflects the innovation and really the real value that it provides to patients***.

***March 13, 2025 Barclays 27th Annual Global Healthcare Conference***

93. On March 13, 2025, Defendant Renz represented the Company at the Barclays 27th Annual Global Healthcare Conference (the "Barclays Conference"). During the Barclays

Conference, Defendant Renz responded to analysts' questions, asserting the success of the Company's patient access strategy and XPHOZAH's long-term $750 million sales target in the following pertinent exchanges:

> [Q: Balaji V. Prasad – Barclays Bank PLC – Director] So what kind of time duration should we think about when you speak about $1 billion or a 10% market share in this segment? And what kind of field force setup would be needed maybe at the time you reach peak sales, what kind of what do we need?
>
> [A: Defendant Renz] ***With our increased sales force, we're now targeting approximately 14,000 writers and those writers include an incremental approximately 5,000 APPs, so advanced practice providers, because that we've found in our work in the first couple of years that there were others within the office dynamics that we're writers***.
>
> So we are trying to drive breadth and depth of those groups. That's our target audience. And we want each of those targets to ask their patients would you like to try something new again, same idea really messaging that over and over again. The composition of matter patent is August of 2033 and so our goal is to drive to that $1 billion target, of course, prior to that date in patent expiry.
>
> ***We're, of course, doing everything we can to accelerate that growth, and we'll be thoughtful in how we add to the sales force and our team. One of the changes our recent new Chief Commercial Officer, Eric Foster made, is we've added some folks that are actually in the field, we call them field access managers, and they're actually out deployed to try to help the pull-through of the scripts***. Again, in this marketplace, there prior auths required. We really want to help the office make this as seamless as possible and get the drug to as many patients as possible.
>
> [Q: Balaji V. Prasad – Barclays Bank PLC – Director] And do you have a long-term guidance of $750 million before peak. Remind us of when the IP expires and what's the trajectory to the $750 million in terms of duration?
>
> [A: Defendant Renz] And looking at the total addressable population, again, there's approximately 550,000 end-stage renal disease patients on dialysis. 40% of them approximately are non-Medicare. So our total addressable market is approximately 220,000 patients. And it's our belief over time that all of these patients at some point are going to need pharmaceutical intervention for their phosphate lowering therapies. ***So we believe we can get a meaningful share of those 220,000 patients***.
>
> ***So in our survey work prior to approval in our first year of launch and even now, we believe that we can achieve at least a 30% market share*** at least the project community believes that's kind of on average, what they think that they would

prescribe to their patients. ***And so if we can make that type of penetration at our price point, we can get to that $750 million of net sales prior to patent expiry***.

[Q: Balaji V. Prasad – Barclays Bank PLC – Director] So I got you right, that the 60% Medicare patients are no longer accessible because of the changes in the reimbursement power.

[A: Defendant Renz] ***They are no longer revenue-generating patients, but we built it as the right thing to do to make our drug available to everyone***. And so our message hasn't changed from March 12 of last year to March 12 of this year, which is -- have the prescription writers, the nephrologist or the nephrologist office to send the script to our ArdelyxAssist, we will evaluate the patient's coverage.

And should they be a commercial payer and that is a revenue-generating script, excellent. If they happen to be a low-income patient, and this was true last year as well. ***And they qualify, we will make sure the program is available through our patient assistance program to get them the drug as well as the mail order***.

***

And so one of our tests that we've evaluated and Eric Foster, our Chief Commercial Officer, has really carefully analyzed is, okay, if you were a commercial patient in 2024 and you're a commercial patient in 2025, are you still getting the drug? And the answer is yes. Are you a new commercial patient in 2025? And are you getting the drug? And the answer is yes. If you are a Medicare patient in 2024, are you getting the drug? And are you getting it still in 2025? And the answer is yes. If you're a new Medicare patient in 2025, are you getting the drug? And the answer is yes.

***So we're very pleased with that our strategy is working***.

[Q: Balaji V. Prasad – Barclays Bank PLC – Director] So you're definitely addressing one part of the equation, which is to ensure that patients don't lose access to the drug. The other part of the equation is on the company itself on mitigating the revenue impact. So how could you counter that? And what could you do to minimize revenue impact?

[A: Defendant Renz] So we will, of course, a setback in 2025 with this reduction from Q4 of '24. But our goal, again, as I just mentioned, is to make it available to everyone and have the nephrologist keep writing. ***So it is a very large addressable market. We're only 1.5 years since approval. And so we need to just continue to have a nephrologist write the script. There's enough of a total addressable market that we believe over time, we will make it -- the revenue guidance long term***.

[Q: Balaji V. Prasad – Barclays Bank PLC – Director] And so to help investors understand this, is there any way you could share metrics ] around this retention of

> patients on XPHOZAH in 2024, with Medicare in 2025. So how can we kind of gauge this or understand this?
>
> [A: Defendant Renz] Sure. I mean, it's a little too early to tell specifically in 2025, we're only about 11 weeks into the year. The overall dialysis particularly around phosphate lowering therapies has been oral tumultuous because of the change that affects all patients, not just related to Ardelyx.
>
> ***And so we want to keep the nephrologist at the center of the decision-making and encourage the dialysis organization to let them know that our Ardelyx's drug XPHOZAH available through our Ardelyx program and to not worry about the other items***. But in general, the space is having some challenges in getting their medicine because it's a new government decision where Medicare no longer includes the oral-only outside as a Part D benefit it has moved into a Part B benefit. And so that is a change for all of us that we have to navigate. And it's too early to tell on a specific basis.

94. The statements referenced in ¶¶82-93 above were materially false and misleading because they failed to disclose material adverse facts about Ardelyx's business, operations, and prospects. Specifically, the Individual Defendants made false and/or misleading statements which failed to disclose, *inter alia*, that: (1) the Company encountered increasingly restrictive payer requirements for its drugs; (2) the Company encountered increasing patient access restrictions; (3) the Company's efforts to address the increasing payer requirements and patient access restrictions were inadequate; (4) as a result of the foregoing, the IBSRELA and XPHOZAH new-patient start rate slowed and harmed the drugs' financial prospects; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

***April 30, 2025 Proxy Statement***

95. On April 30, 2025, the Company filed the 2025 Proxy Statement. Defendants Raab, Bazemore, Bertrand, Bhanji, Cadoret-Manier, Mott, Parsey, and Rodgers solicited the 2025 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

96. The 2025 Proxy Statement called for the Company's shareholders to vote to, *inter alia*, (1) re-elect Defendants Raab and Mott to hold office until the 2028 Annual Meeting of Stockholders; (2) approve, on a non-binding, advisory basis, the compensation of the Company's named executive officers; (3) ratify the selection of Ernst & Young LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2025; and (4) approve an amendment to the Amended and Restated 2014 Equity Incentive Award Plan (the "2025 Amendment of the 2014 Equity Incentive Plan").

97. The 2025 Proxy Statement stated that the 2025 Amendment of the 2014 Equity Incentive Plan would, *inter alia*, increase the maximum number of shares of Common Stock available for grant under the Amended and Restated 2014 Equity Incentive Award Plan (the "Amended and Restated 2014 Equity Award Plan") by 10 million shares. The 2025 Proxy Statement stated that, as of April 15, 2025, the aggregate number of shares of common stock subject to outstanding awards was 38,362,417 shares, and a total of 8,359,043 shares of common stock remained available for future issuance. As per the 2025 Proxy Statement, if the 2025 Amendment of the 2014 Equity Incentive Plan was approved, the Company would have approximately 8,359,043 shares available for grant. The 2025 Proxy Statement identified that under the 2025 Amendment of the 2014 Equity Incentive Plan, "[e]quity awards are intended to motivate high levels of performance, align the interests of our directors, employees and consultants with those of our stockholders by giving directors, employees and consultants the perspective of an owner with an equity stake in our company." The 2025 Proxy Statement further provided that if the 2025 Amendment of the 2014 Equity Incentive Plan was not approved, approved, the Company's incentive plan would continue to be administered in its current form.

98. Regarding the "Role of [the] Board in [the] Risk Oversight Process," the 2025 Proxy Statement stated the following, in relevant part:

> Risk assessment and oversight are an integral part of our governance and management processes. Our board of directors encourages management to promote a culture that incorporates risk management into our corporate strategy and day-to-day business operations. Management discusses strategic and operational risks at regular management meetings, and conducts specific strategic planning and review sessions during the year that include a focused discussion and analysis of the risks facing us. Throughout the year, senior management reviews these risks with the board of directors at regular board meetings as part of management presentations that focus on particular business functions, operations or strategies, and presents the steps taken by management to mitigate or eliminate such risks.
>
> Our board of directors does not have a standing risk management committee, but rather administers this oversight function directly through our board of directors as a whole, as well as through various standing committees of our board of directors that address risks inherent in their respective areas of oversight. In particular, our board of directors is responsible for monitoring and assessing strategic risk exposure and our audit and compliance committee is responsible for overseeing our major financial risk exposures and the steps our management has taken to monitor and control these exposures. The audit and compliance committee also monitors compliance with legal and regulatory requirements and considers and approves or disapproves any related-persons transactions. Our nominating and corporate governance committee monitors the effectiveness of our corporate governance guidelines. Our compensation committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking.

99. Regarding the Audit Committee, the 2025 Proxy Statement stated, in relevant part:

> Our audit and compliance committee oversees our corporate accounting and financial reporting process, the audits of our financial statements, cybersecurity risk and our compliance with legal and regulatory requirements. Among other matters, the audit and compliance committee:
>
> ***
>
> • discusses with management and the independent registered public accounting firm the results of the annual audit and the review of our quarterly financial statements;
>
> • discusses with management and the independent registered public accounting firm regarding the effectiveness of internal controls over financial reporting;
>
> ***

> • is responsible for reviewing our financial statements and our management's discussion and analysis of financial condition and results of operations to be included in our annual and quarterly reports to be filed with the SEC;
>
> • reviews our critical accounting policies and estimates;
>
> • is responsible for being knowledgeable about the content and operation of our global compliance program and exercising oversight over its implementation and effectiveness;
>
> • is responsible for being knowledgeable about the content and operation of our global compliance program and exercising oversight over its implementation and effectiveness;

100. Regarding the Code of Ethics, the 2025 Proxy Statement stated the following:

> We have adopted a code of business conduct and ethics that applies to all of our employees, officers and directors, including those officers responsible for financial reporting. The code of business conduct and ethics is available on our website at http://ir.ardelyx.com/corporate-governance. We expect that any substantive amendments to the code, or any waivers of its requirements, will be disclosed on our website.

101. Defendants Raab, Bazemore, Bertrand, Bhanji, Cadoret-Manier, Mott, Parsey, and Rodgers caused the 2025 Proxy Statement to be false and misleading by failing to disclose*, inter alia*: (1) the Company encountered increasingly restrictive payer requirements for its drugs; (2) the Company encountered increasing patient access restrictions; (3) the Company's efforts to address the increasing payer requirements and patient access restrictions were inadequate; (4) as a result of the foregoing, the IBSRELA and XPHOZAH new-patient start rate slowed and harmed the drugs' financial prospects; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

102. The 2025 Proxy Statement also failed to disclose, inter alia, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual

Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committee's risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

103. As a result of Defendants Raab, Bazemore, Bertrand, Bhanji, Cadoret-Manier, Mott, Parsey, and Rodgers causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Raab and Mott to hold office until the 2028 Annual Meeting of Stockholders; (2) approve, on a non-binding, advisory basis, the compensation of the Company's named executive officers; (3) ratify the selection of Ernst & Young LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2025; and (4) approve the 2025 Amendment of the 2014 Equity Incentive Plan.

104. As a result of the shareholders voting to approve the 2025 Amendment of the 2014 Equity Incentive Plan, an additional 10 million shares were made available for grant.

***May 1, 2025 Financial Reports***

105. On May 1, 2025, the Company issued a press release to announce its financial results for the first quarter of 2025 (the "Q1 2025 Press Release"). The Q1 2025 Press Release noted the Company's strong commercial growth in the first quarter of 2025, including a sales increase of 57% year-over-year for IBSRELA and a 30% increase in XPHOZAH sales (excluding a returns adjustment). The Q1 2025 Press Release also reaffirmed the Company's full year 2025 sales guidance for IBSRELA of $240-$250 million.

106. That same day, the Company hosted an earnings call to discuss with investors and analysts its financial results for the first quarter of 2025 (the "Q1 2025 Earnings Call"). During the

Q1 2025 Earnings Call, Defendant Raab discussed the commercial execution of IBSRELA and the "access complexities" pertaining to XPHOZAH, stating, in relevant part:

> IBSRELA's exciting growth trajectory continues. We delivered one of the highest prescription demand quarters to date during the first quarter, reinforcing our confidence in IBSRELA as a differentiated, important and valuable treatment for patients. IBSRELA's significant long-term potential is supported by a large and growing market and continued unmet need among patients who remain inadequately served by secretagogues. ***Our commercial team is effectively driving prescriber adoption by building clinical conviction among high-value targets, while our expanded field access management team is enhancing patient access and pull-through. Together, these efforts are positioning IBSRELA for sustained growth and deeper market penetration. We are on track to meet our 2025 guidance of $240 million to $250 million in net sales, and we have a clear path to achieving peak annual net sales revenue of over $1 billion***.
>
> ***
>
> ***Our decisions around XPHOZAH remain firmly grounded in a commitment to patient care. Amid this uncertainty, we're encouraged by early signals. Patients across both Medicare and non-Medicare segments are successfully accessing the therapy, and real-time feedback from the field reinforces XPHOZAH's clinical value***. As the environment remains fluid, we are not yet providing formal revenue guidance at this time. Instead, we are closely monitoring uptake and market dynamics, and we will provide further updates as the landscape continues to evolve.
>
> Across the board, Ardelyx continues to execute with resolve, discipline and agility, and we're making progress on our strategic priorities: driving strong commercial execution for IBSRELA; navigating the access complexities and generating important commercial momentum with XPHOZAH; ***building a pipeline to unlock long-term growth; and continually delivering on strong financial performance***.

107. Moreover, Defendant Foster downplayed uncertainty as a result of more stringent prior authorizations and "step edits." Specifically, Defendant Foster stated the following, in relevant part:

> Our decisions around XPHOZAH remain firmly grounded in a commitment to patient care. ***Amid this uncertainty, we're encouraged by early signals. Patients across both Medicare and non-Medicare segments are successfully accessing the therapy, and real-time feedback from the field reinforces XPHOZAH's clinical value***. As the environment remains fluid, we are not yet providing formal revenue guidance at this time. Instead, we are closely monitoring uptake and market dynamics, and we will provide further updates as the landscape continues to evolve.

> ***Across the board, Ardelyx continues to execute with resolve, discipline and agility, and we're making progress on our strategic priorities: driving strong commercial execution for IBSRELA; navigating the access complexities and generating important commercial momentum with XPHOZAH***; building a pipeline to unlock long-term growth; and continually delivering on strong financial performance.

108. In addition, Defendant Renz asserted the Company was "on track" to achieve its expected peak sales, stating the following in relevant part:

> The first quarter demonstrated strong demand for IBSRELA and clear evidence that the XPHOZAH strategy is working. We remain confident that there is a significant opportunity for both of our medicines and that ***we are on track to achieving our peak sales expectations, more than $1 billion for IBSRELA and $750 million for XPHOZAH***. We are building a great company and focused on delivering shareholder value.

109. During the question-and-answer segment of the Q1 2025 Earnings Call, Defendants Raab and Foster emphasized confidence in the Company's $750 million long-term target for XPHOZAH and that patient access for XPHOZAH was improving, in the following exchanges:

> [Q: Roanna Clarissa H. Ruiz – Leerink Partners LLC – Senior Research Analyst] A follow-up about XPHOZAH. I was curious, do you have any updates on the -- how the patient assistance program is operating right now and some of your plans to keep going forward into 2Q and 3Q? And the second part of it is, I was also curious, off the last question, thinking about commercial and non-Medicare, how are those trends possibly tracking into exiting 1Q and thinking about 2Q and 3Q?
>
> [A: Defendant Foster] So with regards to PAP or the patient assistance program, we're very pleased with how the ArdelyxAssist is being able to help patients in need, particularly those Medicare patients. ***We saw patients that were on XPHOZAH for Medicare Part D in Q4, they were able to continue accessing XPHOZAH in Q1 through our patient assistance program. So I would say, we were very pleased with being able to help those patients out and certainly new patients as they come on in first quarter. We are in this for the long term***. For us, it's paramount that we are able to provide access for those patients in need. And so, we're not looking at it on a quarterly basis. It's not a Q2, Q3, Q4 decision for us. We're continuing to move forward so that all patients, regardless of Medicare and non-Medicare, have coverage for XPHOZAH.
>
> [A: Defendant Raab] the confidence that we have coming from January, where everything -- everyone was wondering how this was going to work. And then, as it

progressed through to March, the strategy is working…***I'm very pleased the way that the team has actually helped them navigate through it, and the strength of the ArdelyxAssist team and the program there, in particular, is paying dividends***.

***

[Q: Aydin Huseynov – Ladenburg Thalmann & Co. – Director] So I appreciate XPHOZAH's long-term guidance confirmation of $750 million. So could you provide some dynamic of sort of how you plan to get there sort of ramp-up curve? And if possible, any 2025 sort of soft guidance kind of hints? And does the long-term guidance not include Medicare? And in case you'll be able to sort of include Medicare further on, how would that actually affect the upside for XPHOZAH sales, peak sales?

[A: Defendant Raab] Let me address that for you is, we assume Medicare is not part of the mix in terms of paying for XPHOZAH for those patients. That's roughly 60% of the dialysis population is Medicare. Non-Medicare is primarily Medicaid and commercial. ***And the comments from both Eric and I that what we see already in the first quarter makes us feel confident that, that is going to be what we are able to confidently get to $750 million***. As we've said last year, as we were entering this year and reaffirmed in my opening comments, it's too early for us to be giving you guidance as to what 2025 is going to look like.

[Q: Aydin Huseynov – Ladenburg Thalmann & Co. – Director] It's -- how much of the decision-making by nephrologists may affect the insurance coverage? And have you seen any pushback from payers so far for XPHOZAH, given your sort of ongoing negotiations with CMS?

[A: Defendant Foster] ***Yes. I would just say, right now, we're really not seeing any pushback on the commercial side***. And it's good to see that the nephrologist still has the ownership and really is at the decision -- the center of the decision-making. And for those patients that need it, if they have commercial coverage, then certainly the physician can write for it, and we've got confidence that the patient can get it on the commercial side.

***June 4, 2025 Jefferies Global Healthcare Conference***

110. On June 4, 2025, Defendant Raab represented the Company at the Jefferies Global Healthcare Conference (the "Jefferies Conference"). During the Jefferies Conference, Defendant Raab asserted the Company's confidence in its IBSRELA guidance and XPHOZAH's peak-sales target of $750 million in the following pertinent exchanges with analysts:

[Q: Yuchen Ding – Jefferies LLC – Equity Analyst] And then as you think about Q2, and we're already in June, right? So 2 out of 3 months have already been behind us. So how -- like how have demand -- how has demand looked in Q2? And how do you think about that trajectory moving forward?

[A: Defendant Raab] Well, I think if you look at the demand in Q2, ***what I just reaffirmed is the $240 million to $250 million for what we provided as guidance for the year, that's something that we're confident that we're going to hit***. So pretty straightforward. If you look at what that shortfall was in consensus, add that back in, you can see what the trajectory would be to get to those numbers.

[Q: Yuchen Ding – Jefferies LLC – Equity Analyst] Why don't we shift over to XPHOZAH. Tell us a little bit about Q1, the $25 million and just what you have seen on the ground and like what contributed to that number as well as just some of the underlying demand trends that you guys are seeing.

[A: Defendant Raab] So that's 330,000 patients, the 550,000 are now Medicare patients and XPHOZAH is not available to them because binders moved into the bundle and Medicare Part B is employed. So what we have encouraged nephrologists and health care practitioners is to continue doing what they've been doing in the past, meaning sending their prescription to our hub and that we can adjudicate whether it's a Medicare, Medicaid, commercial, TRICARE VA. And then either for a Medicare patient, if they qualify, we get free drug, non-revenue product. And if you qualify, you then go through the normal processes of getting coverage approved through your insurance.

***

***So from a launch perspective, if you want to think of it that way, we're doing extremely well in terms of where XPHOZAH is***. Is it flat? Is it growing at the rate we want? Of course, not, because that turmoil, that chaos has really been a problem for the treating health care practitioners and most importantly, for the patients. But we are seeing the pull-through happening. And the field force out there is focused on those physicians who have written successfully in 2025 because the number of patients that they have allow you to go deep in those patients in order to get them pulled through. So that's a big part of our focus in the near term. Depth absolutely first and foremost, and beginning to expand into breadth.

***I'm confident that we're going to end up in the place that we need to. Remember, what we guided everyone to is $750 million of peak sales for XPHOZAH***. What does that look like, right? How, in fact, do I believe that to be possible? Well, if you look at our WACC, and modest price increases over time. You assume 5 prescriptions per year, which is what you see for binders, maybe we can do better with a small molecule tiny pill. That's about $12,500 per annum per patient. You divide that $750 million by 12,500, 60,000 patients. That's it. Of 220,000 patients, you need to penetrate 30% of those. Knowing what we did in 2024, the benefit that

> we provide to those patients, it's hard to imagine that we can't accomplish what I just described.

***August 4, 2025 Financial Reports***

111. On August 4, 2025, the Company issued a press release to announce its financial results for the second quarter of 2025 (the "Q2 2025 Press Release"). The Q2 2025 Press Release reported a "record $97.7 million in total revenue, reflecting 33% growth year-over-year." Moreover, the Q2 2025 Press Release stated that "[o]ur confidence in IBSRELA continues to grow, and we are raising our 2025 revenue expectations to $250-$260 million. XPHOZAH also delivered a very encouraging quarter with significant prescription growth compared to the first quarter of 2025."

112. That same day, the Company hosted an earnings call to discuss with investors and analysts its financial results for the second quarter of 2025 (the "Q2 2025 Earnings Call"). During the Q2 2025 Earnings Call, Defendant Foster discussed, *inter alia*, IBSRELA and XPHOZAHs' purported record demand, IBSREALA's improving prescription pull-through, and XPHOZAH's improving patient access. Specifically, Defendant Foster stated, in relevant part:

> IBSRELA recorded an impressive $65 million in net sales revenue for Q2, demonstrating 84% year-over-year growth and 46% quarter-over-quarter growth. we saw a clear acceleration in demand, delivering our strongest quarter since launch, supported by growth across all key demand indicators compared to the first quarter of this year. ***This performance was driven by focused commercial execution, which generated growth in both breadth and depth of prescribing and an improvement in prescription pull-through***.
>
> During the quarter, the team drove significant increases in new and total prescriptions through increased field activities to targeted HCPs. ***We also deployed highly effective marketing activities, including peer-to-peer HCP education programs and digital HCP and consumer engagement. By focusing on increasing the breadth of writers, we generated growth in new writers, new prescriptions and new patient starts***. In addition, existing writers expanded their view of patients they consider candidates for IBSRELA and in turn, increased their depth of prescribing. We were also pleased to see that refills made up a greater proportion of

prescriptions in Q2, which means new prescriptions are spinning off more refills. Both new and refill prescriptions reached all-time highs.

***We also saw early evidence that the investment in the field access manager team is having a positive impact on our prescription pull-through***. The team focused on educating offices to ensure that providers can navigate the access landscape, if needed. We are seeing early indicators that approval rates and resubmission rates are improving.

***

As we look to the second half of the year, we remain focused on executing at a high level and expect our strong momentum to continue. We are raising our guidance for this year. ***We are confident in our ability to deliver peak sales of more than $1 billion***.

Now on to XPHOZAH. We are very pleased with the performance that XPHOZAH delivered in the second quarter, delivering $25 million in net product sales revenue a 27% increase over the first quarter of this year when the onetime Q1 reserve release is excluded, driven by meaningful demand growth.

***

***Core to our strategy is driving prescriptions to ArdelyxAssist in order to support patients and providers as they navigate the access landscape in this new environment***. During the second quarter, we saw growth in the percentage of prescriptions growing through ArdelyxAssist and the number of target HCPs who have had a patient successfully access XPHOZAH through ArdelyxAssist. Both are strong indicators that we are gaining momentum in this new environment.

We have grown the total number of paid prescriptions month-over-month since March, and we are focused on continuing that steady and consistent growth for the remainder of the year by generating greater depth and breadth in prescribing among XPHOZAH writers. ***To support patient access, we will continue to engage and partner with leadership teams and dialysis providers on ways to educate and support access to XPHOZAH***.

***Finally, on patient pull-through, we will continue to support HCPs and patients in their prior authorization and pull-through needs. ArdelyxAssist plays an integral role regardless of payer, and we remain committed to patient access for the long term***. As you can see, the XPHOZAH team is focused on the right areas, and we are delivering strong results. We know there continues to be a significant unmet need among patients with elevated phosphorus despite treatment with binders, and we seek to deliver on that opportunity. ***As such, we remain confident in our ability to achieve peak sales of $750 million***.

113. Also during the Q2 2025 Earnings Call, Defendant Renz emphasized IBSRELA and XPHOZAHs' continued patient demand and noted XPHOZAH's sequential revenue growth. Specifically, Defendant Renz stated the following, in relevant part:

> During the second quarter of 2025, we recorded IBSRELA net product sales revenue of $65 million, an increase of 84% over the same period last year. ***IBSRELA has demonstrated consistent growth since launch, and our strong performance in the second quarter was a reflection of the continued patient demand***.
>
> ***
>
> ***We expect IBSRELA to continue its strong performance for the remainder of 2025. And as such, we are raising our guidance and currently expect to finish the year with between $250 million and $260 million in net product sales revenue***. We expect this growth to be driven by patient demand and improved prescription pull-through as well as modest improvements in our gross to net deduction.
>
> XPHOZAH also had a very encouraging performance, recording $25 million in sales during the second quarter of 2025, which we delivered despite the loss of our largest payer, Medicare, compared to $37.1 million we recorded during the second quarter of last year. ***The $25 million for XPHOZAH we reported for Q2 reflects a 7% increase in net sales revenue from Q1 of 2025, driven by patient demand***. As a reminder, our first quarter XPHOZAH net sales revenue included a $3.8 million returns reserve release. Excluding the reserve release, we delivered a 27% increase in net sales revenue compared to Q1 of 2025.

114. During the question-and-answer portion of the Q2 2025 Earnings Call, Defendant Raab, Renz, and Foster responded to analyst questions by asserting their confidence in IBSRELA's growth prospects and XPHOZAH's improving trends in the following exchanges:

> [Q: Yuchen Ding – Jefferies LLC – Equity Analyst] One is on IBSRELA. So talk about the new guidance and what's factored into that. It seems a little bit conservative given the demand and scripts that we're seeing and also the fact that $8 million of that $10 million raise came from the Q2 beat. So I'm wondering if there's anything that we are not thinking about, but you are seeing on the ground? And then my second question is on XPHOZAH. Can you remind us what the gross to net was in Q2? I think you may have said 29%, which is surprising given that's better than Q1 but you are booking only commercial and Medicaid revenue in Q2, which have worse gross to net than Medicare.

[A: Defendant Raab] ***With the first, you should know us well enough by now that when we give numbers, we are thoughtful and deliberate about what we say. Nothing to read into this, except that, that $10 million increase in our guidance is a meaningful step in the right direction of what this opportunity is***. And I think should put little doubt in people's minds about our long-term projections, the opportunity for this business. So I would focus on that. And with opportunity to give you more perspective on how we believe this year will play out, we certainly will provide that.

[A: Defendant Renz] So you're correct. In Q1, when one excludes that onetime returns reserve release we did, our gross to net would have been approximately 31%. And for Q2, it was approximately 29%. It does pertain to product mix, right, patient mix and who the payer is. So those are pretty close to each other. There's really mild differences. ***We did have an improvement in commercial co-pay. That was the primary driver. Again, co-pay for both of our products typically improves over the course of the year***. Many of our patients are on what I'll call calendar year health care plans. So if they're commercial patients, they may have a higher deduct in the beginning part of the year, and it improves for them as a patient over time.

So the primary difference between Q1 and Q2 is on the amount of commercial copay that we need to, again, help the patient and patient assistance. I would look for it to be in that 30% range in general for the rest of this year. Again, 29% to 31% is a reasonable range. And we're still learning in the new environment, there might be minor changes here and there, but I expect it to be in that general range.

***

[Q: Ryan Phillip Deschner – Raymond James & Associates – Senior Research Associate] I'm curious how much of this quarter's IBSRELA sales growth be attributed to expanded sales team now that it's firing on all cylinders and you've got 3 full quarters in. Do you expect continued meaningful script pull-through acceleration into 2026 due to this expanded field team? Or will that start to taper off around that time?

[A: Defendant Foster] As I said in my earlier comments, we're 3 full quarters post completion of the expansion. ***So obviously, with increased call activity, we're seeing significant increase in terms of number of writers leading to increase in new and refill prescriptions. We expect that to continue. Just to remind you, I mean, there's significant opportunity in this market***. Only 1/4 of patients we know are satisfied in this large market with being on therapy with the secretagogue. So we feel very confident in the opportunity that's in front of us. With this increased activity, we certainly expect it to continue for the remainder of the year.

***

[Q: Laura Kathryn Chico – Wedbush Securities, Inc. – Senior VP of Equity Research] Mike, if you can kind of recalibrate for us and just tell us what gives you

confidence in the new peak estimate for XPHOZAH that you're seeing now in this reimbursement environment? And when might you be in a position to restore guidance for XPHOZAH?

[A: Defendant Raab] In terms of guidance for XPHOZAH, we will provide it. As we said in our comments, we saw month-over-month growth since March. And I would like a little bit more consistency before we get out there with numbers for you. As you can imagine, we continue to be thoughtful about what we say and when we say it. ***For me, that question that you asked at the beginning in terms of what gives me confidence is with a total available market of 220,000 patients, which is basically what we are now, given that's the non-Medicare segment. The math is pretty straightforward***.

As you look at our guidance of $750 million with a number of scripts, if you use binder script refills, you use our WACC with modest price increases over time, it's substantively less than 100,000 patients that gets you to that $750 million. ***So I've got great confidence in this trajectory and the performance that we're seeing here and our commitment to the patients. I have great faith in the XPHOZAH team and Eric, the pull-through work that the fans are doing across the board, the marketing efforts, the entire XPHOZAH team is focused on what's doing right for these patients***. And as a result, we writ large, have great confidence in that number that we provided.

***

[Q: Prakhar Agrawal – Cantor Fitzgerald & Co. – Senior Biotech Analyst] So maybe just comment on how do you see IBSRELA trends for the rest of the year and just the market overall.

[A: Defendant Raab] As I said at the start with the first question I got was what do we think about this $250 million to $260 million compared to performance and exactly what you just described. ***With an opportunity to provide you more perspective as we go through the rest of the year, we certainly will do that. This is a meaningful step for us to give a $10 million increase in our guidance***. We haven't done that before in this way. So we are going to take mindful and thoughtful steps as we see the performance show itself.

[Q: Prakhar Agrawal – Cantor Fitzgerald & Co. – Senior Biotech Analyst] And I realize -- on XPHOZAH, I realize you're not providing the guidance, but consensus is sitting at $99 million for the full year. So maybe if you could comment on your comfort on where the Street estimates are for XPHOZAH for the full year? And would you expect sequential quarterly growth for XPHOZAH for the rest of the year?

[A: Defendant Raab] Yes. Nice question because you're going to -- you corner me into giving you guidance. But I won't bite on all of it. ***What I will bite on is we just***

> ***scored a $25 million quarter that we've said is based upon true real demand on the non-Medicare population***. And do the math if it was flat and not much gets us to exactly the kind of modest growth that you would need. ***So I feel very good about the trajectory that we're on. And I feel confident that we will, in the not-too-distant future, be able to provide you some guidance***.

***September 3, 2025 Citi Biopharma Back to School Conference***

115. On September 3, 2025, Defendants Raab and Foster represented the Company at the Citi Biopharma Back to School Conference (the "Citi Conference"). During the Citi Conference, Defendants Raab and Foster responded to analyst questions by emphasizing the Company's sales force, IBSRELA's continued growth, and XPHOZAH's improving demand and patient access in the following pertinent exchanges:

> [Q: Yigal Dov Nochomovitz – Citigroup Inc. – Biotech Analyst] So I guess maybe to start out, Mike, if you want to just kind of summarize where you are with the business, 2 products that are gaining momentum.
>
> [A: Defendant Raab] So the growth is there. Is it growing as fast as we would like? Not yet. But I think the turmoil that the dialysis community is experiencing really speaks to why that is happening. But you do see the conviction of physicians to get their patients on XPHOZAH. So very excited about that. ***I think with what you're seeing with IBSRELA, the growth that we saw in Q2 only continues. And our enthusiasm for having IBSRELA be a $1 billion drug clearly is there, if you look at the growth rate and how that continues. So $1 billion is certainly on the horizon for us and with IBSRELA and excited about the $750 million that we're confident we will meet with XPHOZAH***.
>
> [Q: Yigal Dov Nochomovitz – Citigroup Inc. – Biotech Analyst] And how do you identify those patients? Because you can have people that are not satisfied with the drug, but then they may not know what else is out there, right? So how do you get to that?
>
> [A: Defendant Foster] So we certainly -- we have our sales force, which, as you know, completed its sales force expansion at the end of Q3 last year. ***So we've got 3, full quarters under our belt and really feel like they're hitting their stride***. We also have great omnichannel marketing that's out there that's bringing awareness, greater awareness of IBSRELA out there, not just to patients, but also to physicians.
>
> [Q: Yigal Dov Nochomovitz – Citigroup Inc. – Biotech Analyst] And remind us what the guidance -- just -- you raised it a little bit, right? Just remind everyone what it was and what it is now. And did you give it for each product.

[A: Defendant Raab] So no, we gave guidance for IBSRELA from $260 million to $250 to -- $250 million to $260 million to $255 million to $265 million. XPHOZAH we're not yet giving guidance. Just given the turmoil that the market has, what we have done is our confident -- spoken about our confidence that XPHOZAH will be $0.75 billion.

[Q: Yigal Dov Nochomovitz – Citigroup Inc. – Biotech Analyst] So let's talk a bit about XPHOZAH. So you've characterized it as kind of like a relaunch, which essentially is what it is, although it's going well. Is it simpler now with this situation?

[A: Defendant Foster] Yes, I'm not sure that it's easy, but I'm really proud of the team and what they've been out there doing. I think just the continuous contact and messaging around access, regardless of who the payer is, patients have access to XPHOZAH. We started that messaging in late last year, been very persistent in Q1 and Q2. For me, Q1 was really about understanding is the strategy working. And I think we got really good strong signals of that in Q1.

And in Q2, it was can we start to grow the market? And can we start to grow the non-Medicare payer segments. ***And as you heard me say in our earnings call, we have seen very positive signs, more new writers, so growth in new writers Q2 versus Q1, new and refill prescriptions growth Q2 versus Q1 and more patients as a percent going on product, whether they're through our patient assistance program or the non-Medicare payer segments are going on product in Q2 versus Q1***.

[Q: Yigal Dov Nochomovitz – Citigroup Inc. – Biotech Analyst] And now this -- what's going on behind the scenes with some of the legal maneuvering, you've characterized that as kind of just pure upside, don't expect it, but if it happens...

[A: Defendant Raab] I mean if you look at our TAM, which before the TDAPA period was 550,000 patients, get rid of 330,000 or 60% of those patients, which are Medicare, our new TAM is 220,000 patients. And the vast majority of patients are underserved with binders, but self-reported by physicians, they think 30% of their patients are in need of an additional product for managing hyperphosphatemia.

***So if you look at that TAM, those reports from physicians need 60,000 patients to get to $750 million. So we have plenty of room within the 220,000 patients to generate the revenue that we guided to and continue to be able to afford giving patient assistance to those patients that are on Medicare***.

***September 8, 2025 23rd Annual Morgan Stanley Global Healthcare Conference***

116. On September 8, 2025, Defendants Raab and Foster represented the Company at the 23rd Annual Morgan Stanley Global Healthcare Conference (the "Morgan Stanley Conference"). During the Morgan Stanley Conference, Defendants Raab and Foster responded to analyst questions concerning IBSRELA's growth factors and XPHOZAH's expected peak U.S. annual sales of $750 million in the following pertinent exchanges:

> [Q: Bob Klingenberger – Morgan Stanley – Executive Director] And you mentioned the increased guidance for the year, maybe just beginning with IBSRELA, could you give us some kind of color on what's driving that from a – in kind of the commercial strategies that you've all been implementing?
>
> [A: Defendant Foster] Yes, very confident going into Q2. ***When we think about the drivers for the sales team, for IBSRELA, the second quarter was our third full quarter post expansion of the sales force***. Typically, it takes 2 to 3 quarters to get up to speed. The area business directors, they're building relationships, the reach and frequency into the offices. ***And what we saw in Q2 was significant increased activity, which led to more new writers, more total writers and, ultimately, led to more new and refill prescriptions***.
>
> ***
>
> I think it is important to mention that we do have an indication where we can be used first line, and we have seen some of that utilization first line. And really, what we feel there is physician confidence.
>
> So as physicians continue to write for the product, they're seeing the efficacy, the benefit to the patient, giving them greater confidence and they're able to go to it earlier. But we feel like we've got a really winnable position for the long term. ***We are very pleased with the success that we saw in Q2, giving us the confidence to raise guidance to that $250 million to $260 million for the rest of 2025***.
>
> [Q: Bob Klingenberger – Morgan Stanley – Executive Director] And longer term, right, the $1 billion peak sales guidance for IBSRELA, I think that roughly translates to 10% of the market.
>
> [A: Defendant Raab] ***So I think one of the strategies, Eric, if you could talk about it is we have field access managers that really function pulling through the prescriptions that the [ AVDs ] have generated on the top of the funnel. I think it's a really critical part of what we're accomplishing for that growth***.
>
> [A: Defendant Foster] And we saw that early success in Q2. So as Mike mentioned, we expanded our field access manager team. And these are individuals that are in

> the field, working with physicians' offices, working with patients to help be able to pull through that prescription. The last thing we want is for a physician to identify a patient, write a prescription and that patient not be able to have access. ***So we know with the additional help of the field access manager team, we saw an increase in resubmission rates and approval rates early on in Q2***.
>
> So as Mike mentioned, it's really a combination of driving to the top of the funnel, but then ***improving the efficiency of how patients can have access to the product and the physicians so that they can have greater confidence that they know when they write that prescription that the patient will actually receive it.*** And we saw really good indicators of that in Q2. ***And again, all of that together is what's given us that confidence for the remainder of the year and to be able to reach that $1 billion***.
>
> [Q: Bob Klingenberger – Morgan Stanley – Executive Director] Maybe just moving on to the XPHOZAH side. Obviously, this year has been a bit of a kind of a relaunch in terms of strategy.
>
> [A: Defendant Raab] So we gave up 60% of our TAM, right? So 330,000 patients no longer can pay for the drug. But that doesn't prevent us from providing it through our patient assistance program. And the way I look at it is our TAM shrank from 550,000 to 220,000 patients.
>
> ***So what does that mean in terms of for us to get to the $750 million peak that we described, you only need 60,000 of those 220,000. It's 1/3 of that TAM. And given the clear need that's needed for XPHOZAH what's doing for patients, that certainly seems very doable in our mind***. What we do know is if you look at precedent out there of other therapeutics that have gone into the bundle that are innovative, they have some penetration that's better than when it started during the TDAPA period. After that period, it goes away.

***October 30, 2025 Financial Reports***

117. On October 30, 2025, the Company issued a press release to announce its financial results for the third quarter of 2025 (the "Q3 2025 Press Release"). The Q3 2025 Press Release reported that the Company observed $105.5 million in total product revenue, representing 15% year-over-year growth. Moreover, the Q3 2025 Press Release asserted that "IBSRELA continues to perform," noting the product's third quarter revenue of $78.2 million, representing 92% year-over-year growth. In addition, the Q3 2025 Press Release stated that the Company's revenue derived from XPHOZAH was $27.4 million for the third quarter of 2025, representing 9% growth

when compared to the second quarter of 2025. As such, the Q3 2025 Press Release added that the Company anticipated "continued growth in the fourth quarter of 2025."

118. That same day, the Company hosted an earnings call to discuss with investors and analysts its financial results for the third quarter of 2025 (the "Q3 2025 Earnings Call"). During the Q3 2025 Earnings Call, Defendant Foster discussed the Company's business strategies and IBSRELA's demand, revenue, and prescription pull-through figures, stating the following, in relevant part:

> I'm excited to share with you today how this focus drove our performance during the third quarter, starting with IBSRELA. The strong demand for IBSRELA continued during Q3, leading to our highest demand quarter since launch. Additionally, we delivered record highs in the following areas. ***Revenue was $78.2 million, posting 92% growth year-over-year. We continue to see the strength of our field sales force and the impact of our marketing initiatives, which drove us to new highs in new writers and total writers, reflecting growth in both depth and breadth of writing***.
>
> This increase in writers also led to growth in new refill and total prescriptions. Once again, the increased and focused activity from our field access manager team resulted in improved pull-through rates. ***These results clearly indicate that our strategies are working and our strong momentum continues***. We remain focused on the patient, the prescriber and improving prescription pull-through so more patients can benefit from IBSRELA.
>
> ***
>
> Finally, prescription pull-through. The investments we are making in this area are delivering improvements across the patient journey. ***Our field access manager team increased their call activity during Q3, translating into increased rates of prior authorization approvals and resubmission approvals***. We continue to look for ways to improve the patient experience, lessen the burden on HCPs and help ensure that every patient who has prescribed IBSRELA gets on treatment. We are focused on addressing critical aspects of the patient and physician journey and maintaining and building momentum as we enter the fourth quarter.
>
> ***
>
> ***Now turning to XPHOZAH. The team continues to execute and drive demand. In Q3, the team delivered $27.4 million in revenue, a solid 9% revenue growth compared to Q2***. This demand-driven growth demonstrates a clear need among

> patients for XPHOZAH. Our strategy is anchored in access to XPHOZAH for all patients who receive a prescription regardless of payer. ***We are pleased that this strategy is working, and we remain confident in our long-term growth expectations***.

119. During the question-and-answer segment of the Q3 2025 Earnings Call, Defendants Raab and Foster responded to analyst questions concerning the Company's guidance for IBSRELA and XPHOZAH's expected peak U.S. annual sales of $750 million in the following exchanges:

> [Q: Roanna Clarissa H. Ruiz – Leerink Partners LLC – Senior Research Analyst] One for thinking about IBSRELA. What pushes and pulls could impact your ability to reach the high versus low end of your new guidance? It did sound like you're making great strides with new and repeat prescribers as well. Could you give us a little bit more color like what's resonating there?
>
> [A: Defendant Raab] Yes. ***I mean I think the guidance reflects our confidence in what we are doing with all the questions you've heard previously. I think that increased guidance in the range that we've provided is to show you our confidence in what we're going to deliver this year***. I think Eric can go into some more of the specifics around it, but that should speak for itself. I think, Roanna, you've noticed over the years that we've taken a pretty conservative approach in the way that we provide these numbers. What we do is give you numbers that we are confident that we're going to meet. That's been consistently the way we've approached it over the years.
>
> [A: Defendant Foster] Yes. ***Like I said earlier, I mean, we're very confident in the strategy we have. If you think a little bit about what I mentioned earlier, we know that there are millions of patients out there that are -- have been on or are on secretagogue***. Again, more than 75% of those patients continue to experience symptoms of IBS-C. What they need is something different. We know that this is a multifactorial disease. They need something that potentially offers a different mechanism with a proven safety and efficacy profile.
>
> ***
>
> [Q: Yuchen Ding – Jefferies LLC – Equity Analyst] [O]n XPHOZAH, congrats on the progress there, but there's still quite a large gap between where XPHOZAH is now and the $750 million you guys are guiding. What are things that are within your control to really accelerate that?
>
> [A: Defendant Raab] ***We have great confidence in our ability to get to $750 million. I will leave it at that because we've spoken about the specifics numerous times of it's 1/3 of the TAM that we now have of 220,000 patients is what is required to $750 million***. If the need is as extensive and significant as we believe

it is and demonstrated both by the paying and the patient assistance program patients, the turmoil of the TDAPA period is turmoil. Once you get past that, likely that's going to change.

***

[Q: Julian Reed Harrison – BTIG, LLC – Analyst] It's great to see another beat and raise for IBSRELA. You're at more than 70% year-over-year growth at the lower end of the new range for 2025. I guess looking to next year and beyond, I'm curious to what extent you think this cadence of growth can persist?

[A: Defendant Raab] It is exactly what we are doing and should be doing to protect the franchise that we're building. Yes, of course, those things are all the things that we will contemplate and talk about when we can. I think what's important about your question is the growth that you see as you described for IBSRELA, the potential is spectacular, right? If you look at the number of scripts that we have compared to the market that's out there and the growth that is being driven by the need that's out there for the patients by Linzess and others, that is to our benefit over time.

***Our belief is that reaching that $1 billion is something that's well within our control or we wouldn't have said that we expect it to be there. I think as we gain and continue to gain more perspectives and guidance, we can provide more guidance on when and how that is achieved***. We're excited about the future for IBSRELA and what we're doing now, certainly with IBS-C and hyperphosphatemia with XPHOZAH. This mechanism, these drugs are making a huge difference. It's the work that Eric and his team are doing to show that conviction in physicians and getting those prescriptions pulled through.

***

[Q: Aydin Huseynov – Ladenburg Thalmann & Co. – Analyst] You're making almost $400 million in annualized sales. You've got the -- you give about $75 billion long-term guidance and yet you're trading on $1.2 billion market cap. What do you think the market is underestimating, the long-term guidance itself or the future after 2033?

[A: Defendant Raab] I think there's an over-index on XPHOZAH, not giving this engine that we have at IBSRELA that do that it's -- the attention that it's due. What you see in terms of the growth and the benefit that it provides us in profit and operating cash for us to reinvest in the business, whether it is to expand our capacity capabilities on the commercial side, we will be thoughtful and measured in that.

***

> ***I think we've shown everyone again and again and again a meet and beat and that this is a substantive, big and important market, certainly for IBSRELA. As I said in my opening remarks, XPHOZAH is a contributor to that portfolio and will only continue to provide better contribution over time***.

***February 19, 2026 Financial Reports***

120. On February 19, 2026, the Company issued a press release to announce its financial results for the fourth quarter and full year 2025 (the "Q4 2025 Press Release"). The Q4 2025 Press Release reported that "IBSRELA revenue grew 73% in 2025," and that the Company "expects growth in 2026 to be driven by increased clinical conviction and writing among target healthcare prescribers." Moreover, the Q4 2025 Press Release provided guidance for 2026, with expected "full-year 2026 revenue for IBSRELA to be between $410 and $430 million representing at least 50% growth compared to 2025." The Q4 2025 Press Release further provided that the Company anticipated "full-year 2026 XPHOZAH revenue to be between $110 and $120 million."

121. That same day, the Company hosted an earnings call to discuss with investors and analysts its financial results for the fourth quarter and full year 2025 (the "Q4 2025 Earnings Call"). During the Q4 2025 Earnings Call, Defendant Raab stated the following regarding IBSRELA's growth potential and XPHOZAH's patient access, in relevant part:

> Today, I can tell you that our patient-first strategy is working***. More patients now have access to XPHOZAH than ever before, and we're confident in our growth expectations***.
>
> ***
>
> In 2026, we will elevate our organization to even higher levels. Our priorities haven't changed, but our expectations for them have. We're delivering on our vision for what the future of Ardelyx is becoming a consequential patient-centric enterprise built on a broad, thoughtful portfolio of best-in-class medicines.
>
> We are focused on significantly growing IBSRELA and maintaining XPHOZAH's momentum. ***With the guidance we shared in January, IBSRELA is clearly demonstrating its blockbuster potential and is on track to deliver $1 billion in revenue in 2029 with significant growth thereafter***.

122. Defendant Foster likewise emphasized IBSRELA's growth potential and XPHOZAH's improved patient access, stating the following, in relevant part:

> We grew IBSRELA by more than 70% versus the prior year with record highs across all key performance metrics.
>
> For XPHOZAH, we ensured patient access continued, and we increased total dispenses year-over-year. Our teams drove clinical conviction among HCPs, created greater brand awareness for patients and ensured the prescriptions that were written were filled.
>
> ***We thoughtfully invested across the commercial organization to improve the patient and HCP journey and accelerate access to our medicines. Those investments turned into consistent quarter-over-quarter growth for both IBSRELA and XPHOZAH and set the stage for what will be an important growth year in 2026***.
>
> ***
>
> Our strategy, increasing depth and breadth of writing, strengthening our engagement with patients and supporting prescription pull-through drove notable increases in new and total writers as well as new and refill prescriptions. In the fourth quarter, we finished the year with a record high number of total writers and new and refill prescriptions.
>
> We are confident we have the right levers to drive significant demand. To allow us to capture more of the IBS-C market in 2026 and well into the future, we are investing in 3 key areas.
>
> ***First, the prescriber continues to be a key focus. We continually optimize our field sales team to drive greater reach and frequency with our target, high-writing health care providers who represent approximately 50% of the IBS-C total prescription market***.
>
> ***
>
> This year, we are increasing our opportunities to engage directly with patients. Our plans are to educate, empower and mobilize patients to take control of their IBS-C by seeking new information and talking to their doctor about the symptoms and the treatment options that are available.
>
> ***We continue to drive significant volume at a rapid pace by activating patients, deepening and broadening, writing among target health care prescribers and continually improving our prescription pull-through***.

***

> Moving on to XPHOZAH. In 2025, we had consistent growth quarter-over-quarter through the year. I'm proud of our team's ability to navigate the market while also improving patient access to its highest point since launch and increasing total dispenses by 9% and paid dispenses by 41% when excluding Medicare compared to 2024.
>
> ***We are pleased with the performance in 2025 and confident in achieving the growth we expect in 2026. XPHOZAH will continue to be a contributor for Ardelyx, and our primary focus remains on supporting and ensuring access for all patients regardless of insurance coverage***.
>
> We will continue to drive clinical conviction among health care providers for earlier utilization while also growing the prescriber base and expanding depth of prescribing.

123. Further, Defendant Hohenleitner reemphasized the Company's full year 2026 guidance, stating the following, in relevant part:

> We now have had 2 consecutive quarters that we generated positive cash flow due to growing revenue. Now turning to guidance for 2026. First, looking at our revenue projections for IBSRELA, ***we continue to anticipate 2026 revenues for IBSRELA to be between $410 million and $430 million***. That represents at least 50% year-over- year growth at the low end of the guidance range. Similar to 2025, we expect growth to be driven by quarter-over-quarter increases in demand, along with improved prescription pull-through.
>
> As for the phasing of revenue, we expect the overall market dynamics in 2026 to be similar to those we saw last year.
>
> ***
>
> IBSRELA will have the same winnable position, and we anticipate volume growth to continue until we face generic competition. Now turning to XPHOZAH. We expect revenues to be between $110 million and $120 million in 2026. ***We're focusing on driving depth and breadth of XPHOZAH prescribing and investing at an appropriate level to ensure that XPHOZAH remains a financial contributor for Ardelyx***.
>
> We expect that XPHOZAH will experience similar market dynamics in the first quarter as IBSRELA. ***We are reaffirming our expectations of $750 million before the expiration of the XPHOZAH method of use patent in 2034***. And as is the case

with IBSRELA, XPHOZAH growth is expected to continue until we face generic competition.

124. During the question-and-answer portion of the Q4 2025 Earnings Call, Defendants Raab and Foster responded to analyst questions concerning IBSRELA's 2026 guidance in the following pertinent exchanges:

> [Q: Anthea Theresa Li – Jefferies LLC – Equity Associate] Could you talk about your level of confidence on the underlying volume growth for IBSRELA to get to your $410 million to $430 million IBSRELA guidance? What's really driving that outside of big TAM? And how much of that guidance assumes improvements on the pull-through and the shift to specialty pharmacies?
>
> [A: Defendant Raab] First, I mean let me address that from a top line, we wouldn't give you the guidance. We have great confidence in reaching that number. As we've talked over the years, Anthea and with Dennis, is if you look at the size of this market, and ***the number of patients that are needing a new alternative versus what they have with secretagogue, there's a vast patient population out there to access this. So our confidence is significant and hasn't wavered, honestly***.
>
> [A: Defendant Foster] As Mike said, we've got tremendous confidence in the guidance that we've given for 2026. ***In order to drive volume, we're continuing to optimize our sales force. Last year, the team did an excellent job in execution was able to drive the 73% growth. And we'll continue to optimize that so they can drive top of the funnel***.
>
> As Mike said, 77% of the patients out there on secretagogue are currently continuing to experience symptoms. ***So we know that the market is there. As it relates to pull-through, we are going to double our field reimbursement manager team***.
>
> We know that they provided significant value to us last year and relates to increase in approvals and resubmission rates. So we know that we can continue to improve there, and we've got a team that's going to expand and refocus there.
>
> ***
>
> ***So when you think about all those 3 things together, we feel really good about 2026 and what we're going to be able to deliver***.
>
> ***
>
> [Q: Jennifer M. Kim – Cantor Fitzgerald & Co. – Analyst] So with the IBSRELA drug on IBS-C, I wanted to understand where is the greatest opportunity? And what

> is driving the market growth of double digit? And how sustainable do you think it's going to be?
>
> [A: Defendant Raab] I think in the previous question that I answered with 50,000 patients coming in every month from the GCC agonist already, there is a -- and 7 million patients already on therapy. ***There's a very small percentage of that, that ultimately we need to get to $1 billion. So confidence in there is high, particularly given our clinical differentiation***.
>
> And with the XPHOZAH very much the same kind of dynamic, right? I mean if you look at the Medicare population that we lost, the original numbers I've gone to before is 550,000 patients on dialysis 60% of those are Medicare. You lose those 330 -- 220,000 patients that are Medicaid and Medicare. Those are revenue-generating patients for us. ***It's less than 100,000 patients closer to 50,000 that you require in order to get to the guidance that we gave***.

125. The statements referenced in ¶¶105-124 above were materially false and misleading because they failed to disclose material adverse facts about Ardelyx's business, operations, and prospects. Specifically, the Individual Defendants made false and/or misleading statements which failed to disclose, *inter alia*, that: (1) the Company encountered increasingly restrictive payer requirements for its drugs; (2) the Company encountered increasing patient access restrictions; (3) the Company's efforts to address the increasing payer requirements and patient access restrictions were inadequate; (4) as a result of the foregoing, the IBSRELA and XPHOZAH new-patient start rate slowed and harmed the drugs' financial prospects; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

***April 29, 2026 Proxy Statement***

126. On April 29, 2026, the Company filed the 2026 Proxy Statement. Defendants Raab, Bazemore, Bertrand, Bhanji, Cadoret-Manier, Mott, Parsey, and Rodgers solicited the 2026 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

127. The 2026 Proxy Statement called for the Company's shareholders to vote to, *inter alia*, (1) re-elect Defendants Bazemore, Bhanji, and Rodgers to hold office until the 2029 Annual Meeting of Stockholders; (2) approve, on a non-binding, advisory basis, the compensation of the Company's named executive officers; (3) approve, on a non-binding, advisory basis, the frequency of an advisory vote to approve compensation of the Company's named executive officers; (4) ratify the selection of Ernst & Young LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2026; and (5) approve an amendment to the Amended and Restated 2014 Equity Incentive Award Plan (the "2026 Amendment of the 2014 Equity Incentive Plan").

128. The 2026 Proxy Statement stated that the 2026 Amendment of the 2014 Equity Incentive Plan would, *inter alia*, increase the maximum number of shares of Common Stock that available for grant by 9 million shares. The 2026 Proxy Statement further stated that, as of March 31, 2026, the aggregate number of shares of common stock subject to outstanding awards was 41,572,585 shares, and a total of 10,240,799 shares of common stock remained available for future issuance. As per the 2026 Proxy Statement, if the 2026 Amendment of the 2014 Equity Incentive Plan was approved, the Company would have approximately 19,240,799 shares available for grant. The 2026 Proxy Statement identified that under the 2026 Amendment of the 2014 Equity Incentive Plan, "[e]quity awards are intended to motivate high levels of performance, align the interests of our directors, employees and consultants with those of our stockholders by giving directors, employees and consultants the perspective of an owner with an equity stake in our company." The 2026 Proxy Statement further provided that if the 2026 Amendment of the 2014 Equity Incentive Plan was not approved, approved, the Company's incentive plan would continue to be administered in its current form.

129. Regarding the "Role of [the] Board in [the] Risk Oversight Process," the 2026 Proxy Statement stated the following, in relevant part:

> Risk assessment and oversight are an integral part of our governance and management processes. Our board of directors encourages management to promote a culture that incorporates risk management into our corporate strategy and day-to-day business operations. Management discusses strategic and operational risks at regular management meetings, and conducts specific strategic planning and review sessions during the year that include a focused discussion and analysis of the risks facing us. Throughout the year, senior management reviews these risks with the board of directors at regular board meetings as part of management presentations that focus on particular business functions, operations or strategies and presents the steps taken by management to mitigate or eliminate such risks.
>
> Our board of directors does not have a standing risk management committee, but rather administers this oversight function directly through our board of directors as a whole, as well as through various standing committees of our board of directors that address risks inherent in their respective areas of oversight. In particular, our board of directors is responsible for monitoring and assessing strategic risk exposure and our audit and compliance committee is responsible for overseeing our major financial risk exposures and the steps our management has taken to monitor and control these exposures. The audit and compliance committee also monitors compliance with legal and regulatory requirements and considers and approves or disapproves any related-persons transactions. Our nominating and corporate governance committee monitors the effectiveness of our corporate governance guidelines. Our compensation and leadership development committee assesses and monitors whether any of our compensation policies and programs has the potential to encourage excessive risk-taking.

130. Regarding the Code of Ethics, the 2026 Proxy Statement stated the following:

> We have adopted a code of business conduct and ethics that applies to all of our employees, officers and directors, including those officers responsible for financial reporting. The code of business conduct and ethics is available on our website at http://ir.ardelyx.com/corporate-governance. We expect that any substantive amendments to the code, or any waivers of its requirements, will be disclosed on our website.

131. Regarding the Audit Committee, the 2026 Proxy Statement stated, in relevant part:

> Our audit and compliance committee oversees our corporate accounting and financial reporting process, the audits of our financial statements, cybersecurity risk and our compliance with legal and regulatory requirements. Among other matters, the audit and compliance committee:

***

• discusses with management and the independent registered public accounting firm the results of the annual audit and the review of our quarterly financial statements;

• discusses with management and the independent registered public accounting firm the effectiveness of internal control over financial reporting;

***

• is responsible for reviewing our financial statements and our management's discussion and analysis of financial condition and results of operations to be included in our annual and quarterly reports to be filed with the SEC;

• reviews our critical accounting policies and estimates;

• is responsible for being knowledgeable about the content and operation of our global compliance program and exercising oversight over its implementation and effectiveness;

132. Defendants Raab, Bazemore, Bertrand, Bhanji, Cadoret-Manier, Mott, Parsey, and Rodgers caused the 2026 Proxy Statement to be false and misleading by failing to disclose*, inter alia*: (1) the Company encountered increasingly restrictive payer requirements for its drugs; (2) the Company encountered increasing patient access restrictions; (3) the Company's efforts to address the increasing payer requirements and patient access restrictions were inadequate; (4) as a result of the foregoing, the IBSRELA and XPHOZAH new-patient start rate slowed and harmed the drugs' financial prospects; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

133. The 2026 Proxy Statement also failed to disclose, *inter alia*, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2026 Proxy Statement's descriptions of the Board's and its committee's

risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

134. As a result of Defendants Raab, Bazemore, Bertrand, Bhanji, Cadoret-Manier, Mott, Parsey, and Rodgers causing the 2026 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Bazemore, Bhanji, and Rodgers to hold office until the 2029 Annual Meeting of Stockholders; (2) approve, on a non-binding, advisory basis, the compensation of the Company's named executive officers; (3) approve, on a non-binding, advisory basis, the frequency of an advisory vote to approve compensation of the Company's named executive officers; (4) ratify the selection of Ernst & Young LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2026; and (5) approve the 2026 Amendment of the 2014 Equity Incentive Plan.

135. As a result of the shareholders voting to approve the 2026 Amendment of the 2014 Equity Incentive Plan, an additional 9 million shares were made available for grant.

***April 30, 2026 Financial Reports***

136. On April 30, 2026, the Company issued a press release to announce its financial results for the first quarter of 2026 (the "Q1 2026 Press Release"). The Q1 2026 Press Release reported that the Company observed a "total product revenue of $93.4 million, reflecting 38% growth year-over-year." The Q1 2026 Press Release further noted that the revenue deriving from IBSRELA increased by roughly 58%, and reaffirmed the Company's full-year 2026 revenue guidance, namely IBSRELA revenue between $410 and $430 million and XPHOZAH revenue between $110 and $120 million.

137. That same day, the Company hosted an earnings call to discuss with investors and analysts its financial results for the first quarter of 2026 (the "Q1 2026 Earnings Call"). During the

Q1 2026 Earnings Call, Defendant Raab emphasized the Company's "significant year of growth," stating, in relevant part:

> ***2026 is poised to be another significant year of growth for our company, and we're already off to a great start. At Ardelyx, we're building an innovative pipeline of medicines for patients with unmet medical needs***. Our first quarter's performance reinforces our confidence in the strategy we've laid out and in our ability to capture the opportunities ahead to create long-term value. As we build on this momentum, our focus is on executing on our 4 key priorities: ***accelerating the growth of IBSRELA, maintaining the XPHOZAH momentum, building and expanding our pipeline and delivering strong financial results***.
>
> ***
>
> ***Finally, we remain in a position of financial strength. Our Q1 revenue performance positions us to reiterate our previously communicated full year 2026 revenue guidance for IBSRELA and XPHOZAH***. We have the flexibility to allocate capital to both near-term commercial execution and investments that will expand our pipeline to drive long-term growth value for the company, our patients and our shareholders. ***I am confident in our strategy and our team's ability to deliver on our key priorities***. Together, we are advancing a growing, differentiated, innovative pipeline of medicines that address unmet patient needs.

138. Defendant Hohenleitner further discussed the Company's 2026 revenue guidance, stating the following, in relevant part:

> The Q1 2026 demand for IBSRELA increased despite the expected Q1 seasonal dynamics that were further exacerbated by the winter storm. ***We continue to expect IBSRELA revenues to grow quarter-over-quarter for the remainder of the year***.
>
> Revenue for XPHOZAH during the first quarter of 2026 was $23.3 million and on an as-reported basis, remained consistent with the prior year revenue. However, it's important to understand the underlying business results we're seeing. As you may recall, in Q1 2025, we recorded a $3.8 million favorable adjustment related to product returns. Taking that adjustment into account, our paid prescriptions of XPHOZAH revenue actually grew 19% year-over-year.
>
> ***
>
> ***Now turning to guidance for 2026. We are reiterating our 2026 revenue guidance for IBSRELA between $410 million and $430 million. That represents a 50% to 57% year-over-year growth. We expect the growth to be driven by quarter-over-quarter increases in demand, along with improved prescription pull-through.***

> ***Our long-term growth expectation for IBSRELA remains to reach at least $1 billion in 2029, representing a 38% CAGR***.
>
> ***Now turning to XPHOZAH. We are reiterating our revenue guidance between $110 million and $120 million in 2026***. We continue to invest at an appropriate level to ensure that XPHOZAH remains a contributor of financial growth for Ardelyx. Our full year product revenues are expected to grow between 38% and 46%, outpacing our operational expenses, which will grow by approximately 25%, consistent with prior guidance. We are at a stage in our development where it's necessary for us to prudently invest in our growth accelerators, our commercial operations and our pipeline, all of which require high-impact investments in R&D and SG&A.

139. During the question-and-answer portion of the Q1 2026 Earnings Call, Defendant Foster responded to analyst questions concerning IBSRELA's growth drivers in the following exchanges:

> [Q: Laura Kathryn Chico – Wedbush Securities Inc. – Analyst] First, I thought I heard Eric mention an expansion of the field manager level. And I'm just trying to understand if that's more impactful on the depth of prescribing or the breadth of prescribing? And which of those 2 levers impacts hitting the upper range of guidance or kind of impacts the guidance swing there?
>
> [A: Defendant Foster] It's very hard getting the physician to write that first prescription. And so we want to make sure when they write the prescription that they have confidence that it will be filled. And that's what the field reimbursement manager does. They work with the physician's office to ensure as they navigate the payer dynamics that they're able to pull through and get that prescription filled.
>
> ***With regards to physicians as they continue to increase their depth of prescribing, that same confidence is important that not just the first one goes through, but subsequent ones. So that team is really focused on helping the prescriptions get pulled through, whether it's the first prescription or subsequent ones***.
>
> ***
>
> [Q: Andrew Kassin – BTIG, LLC – Analyst] On IBSRELA, which are the growth drivers would you say do you believe still has the most room to grow writers, new prescriptions, refill or pull-through?
>
> [A: Defendant Foster] ***We feel very confident in the position that we have, a winning position sustainable over time that we've had for the past 3 years. And we continue to see an increase in writers, total writers, new writers as well as depth of prescribing, and that's really important***.

> So what that tells you is physicians continue to have confidence in IBSRELA and look at it as a viable option for their patients that are in need.
>
> ***
>
> ***When you think about the IBSRELA Pharmacy Network and being able to improve the fulfillment rate as well as the number of refills for patients, it really is -- really leads to success across the business in those important drivers of the business***. And that's really what gives us that confidence to that $1 billion in 2029 and beyond.

140. The statements referenced in ¶¶136-139 above were materially false and misleading because they failed to disclose material adverse facts about Ardelyx's business, operations, and prospects. Specifically, the Individual Defendants made false and/or misleading statements which failed to disclose, *inter alia*, that: (1) the Company encountered increasingly restrictive payer requirements for its drugs; (2) the Company encountered increasing patient access restrictions; (3) the Company's efforts to address the increasing payer requirements and patient access restrictions were inadequate; (4) as a result of the foregoing, the IBSRELA and XPHOZAH new-patient start rate slowed and harmed the drugs' financial prospects; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

## <u>THE TRUTH EMERGES</u>

### *August 6, 2026 Financial Reports*

141. The truth emerged on August 6, 2026, when the Company issued the Q2 2026 Press Release. The Q2 2026 Press Release reported that the Company's revenue derived from IBSRELA fell below expectations due to "significantly increased utilization management processes from payors." The Q2 2026 Press Release also noted that the Company reduced its full-year 2026

guidance for IBSRELA from $410-$430 million to $350-$370 million and withdrew its long-term XPHOZAH revenue guidance, despite reaffirming its 2026 revenue guidance for XPHOZAH.

142. The Q2 2026 Press Release detailed the Company's revised 2026 financial outlook as follows, in relevant part:

> **<u>Updated Financial Guidance and Outlook</u>**
> - Full-year 2026 revenue guidance for IBSRELA revised to be between $350 and $370 million.
> - Full-year 2026 revenue guidance for XPHOZAH reiterated to be between $110 and $120 million.
> - OPEX guidance revised to be below $500 million.
> - IBSRELA long-term guidance of achieving $1B in revenue remains, and the Company is evaluating the evolving market dynamics and their impact on the timing of this achievement.
> - XPHOZAH long-term guidance is being pulled as the Company assesses evolving market dynamics and growth rates, which have the potential to reshape the long-term market opportunity.

(Emphasis in original).

143. That same day, the Company hosted the Q2 2026 Earnings Call. During the Q2 2026 Earnings Call, Defendant Foster conceded that "significant payer hurdles" impacted IBSRELA's patient access and slowed new-patient starts, stating the following, in relevant part:

> ***[W]e experienced significant payer hurdles that had a direct impact on access to IBSRELA***. While new patient starts have been slowed by these hurdles, we continue to see strong growth in refills and total prescriptions, reaching our highest demand quarter to date. We understand the ongoing market dynamics IBSRELA is facing and are confident that the following 4 actions will position IBSRELA for future growth by addressing increasing payer hurdles and accelerating IBSRELA demand.
>
> ***
>
> While we are encouraged by XPHOZAH performance, we continue to recognize and assess the challenges ahead of us. ***Our focus remains on enhancing the effectiveness of our commercial approach by refining sales force deployment and strengthening engagement with healthcare providers and dialysis organizations***. These initiatives are designed to ensure we're reaching the physicians treating the patients most likely to benefit from XPHOZAH while continuing to build awareness across the nephrology community.

144. Moreover, Defendant Hohenleitner discussed the Company's reduced 2026 IBSRELA guidance and withdrawn long-term target for XPHOZAH, stating the following, in relevant part:

> ***Starting with 2026, for IBSRELA, taking into consideration the current environment and our proactive initiatives to increase access and fulfillment, we have made the prudent decision to lower our full-year 2026 guidance for IBSRELA to a range of $350 million to $370 million***. This revised guidance represents annual growth of more than 30% at the midpoint. This would suggest back-half sales would be roughly 60% of the full year, acknowledging increased sequential revenue growth in the upcoming quarters and in line with prior year's growth patterns.
>
> Now turning to XPHOZAH. We are reiterating our full-year 2026 revenue guidance to be between $110 million and $120 million. Now moving on to OPEX. With the decision to modify our guidance for IBSRELA revenue, we have proactively taken additional efforts to manage spending and are revising our 2026 OPEX guidance to be below $500 million. We are managing the business with discipline as evidenced by these actions.
>
> Moving on to our longer-term guidance. A few things first. Let me be clear. We are still on a path to achieve $1 billion in revenue for IBSRELA. ***However, with the 2026 revenue revision, we are evaluating the evolving market dynamics and the impact on the timing of this achievement. For XPHOZAH, we have been assessing market dynamics as well as future growth projections in a period of uncertainty. Therefore, it is prudent to revisit our internal assumptions and pull our $750 million revenue guidance***.

145. During the question-and-answer portion of the Q2 2026 Earnings Call, Defendant Raab and Foster responded to analyst questions concerning the hurdles affecting the Company's IBSRELA and XPHOZAH guidance, in the following exchanges:

> [Q: Yuchen Ding – Jefferies LLC – Equity Analyst] So #1, it sounds like demand is fine, but access is getting more difficult. I think that's really the new piece of info for me. Can you give more color on what those hurdles are? Are these scripts still getting filled, but it's taking longer? Are they just getting completely blocked or they're more step edits or what's going on there exactly?
>
> And then #2, you guys have called out many times the favorable impact from these specialty pharmacies. It's been around 9 months since that got implemented and you guys have sounded confident the last few months. So is it possible to share a

few quantitative metrics on things like how often are scripts being written as a sign of underlying demand but then actually how many of them are actually getting filled over the last few quarters and I'm assuming that portion or that percentage is getting better over time?

[A: Defendant Raab] One comment though is, I think what was important as we talked about is starting the IPN back at the end of last year. As Eric has mentioned on every call that we do see better fulfillment rates and on average 1 additional prescription that goes through the IPN and the special network that we've established, and incredibly fortunate that we started it then.

***I think as I said in my comments and Eric reiterated, it is the extent of the step edits that have been put in place was not something that one would anticipate with this product. We're clearly getting attention given its growth and success, but you hit the nail on the head. The demand is still there. It is just harder for patients to get through, and that's with the work that Eric and the team are doing with the FRMs and IPN***.

[A: Defendant Foster] ***So 2 things that we were seeing, so 1, we're seeing more step edits and 2, more stringent prior authorizations. So you're exactly right, what we're seeing is more of a slowing of the new patient starts, so not blocking but a slowing due to those 2 things***.

So we feel confident around those 4 actions that we've put in place that we'll be able to accelerate demand as well as improve pull-through as we go through the back half of this year.

***

[Q: Matthew Coleman Caufield – H.C. Wainwright & Co. – Analyst] Just focusing on the discussed access challenges for IBSRELA, appreciated the color in the comments there so far. But are these factors something that's gotten worse over the past couple quarters? Or in other words, what, if anything, has changed for the access challenges over the past 12 months, for example?

[A: Defendant Raab] The thing, if you recall, when we talked about how we approach market access is we have taken a position that we wouldn't rebate, negotiate, and discount until there was a need to. ***And I think what we're seeing here in terms of the step edits and the hurdles that patients are being forced to go through, which is frustrating for everyone, merits the kind of discussions that we're going to begin having and having already with the payer community***.

This is their business. That's what they do. They put step edits and hurdles in place for patients, and ultimately you look to the manufacturer to offset those things. It's a tough business, but ultimately what we have put in place with the FRMs, IPN,

> and the team that Eric has built gets us through those hurdles that exist. That's why we structure it and do it the way we do.
>
> [A: Defendant Foster] Yes, I would just add that when you have the success that we've had really over the past couple of years, one of the things I think that there's a key takeaway here is that payers certainly are paying attention to that. ***And the speed and the extent to which these more stringent PAs and step edits were put in place and the impact of those, you know, we're not really anticipating that it would be as quickly as it was***.
>
> But with that, we feel confident about the things that we started to put in motion late last year and early this year, and are pleased right now that we've got the additional field reimbursement managers in the field to be able to work with physicians and patients to navigate those hurdles.
>
> ***
>
> [Q: Yigal Dov Nochomovitz – Citigroup Inc. – Analyst] I'm just wondering, are you seeing this payer pushback dynamic broadly across the IBS-C categories, so with some of the competitive products as well? And also, is it restricted to just certain plans, you know, like an Aetna or Blue Cross or CVS? Or are you seeing it kind of broadly across all of the payers? And then on XPHOZAH, could you just elaborate a little bit as to why you decided to, just withdraw the $750 million as opposed to revise it down to something that you are more comfortable with?
>
> [A: Defendant Foster] Yes, and then with regards to are we seeing this across the IBS-C category? So, just remembering that our strategy is a bit different from the others. ***And so, just focusing on us, you know, what we've seen is just more stringent prior authorization criteria and ensuring that HCPs are adherent to that criteria. We've seen a bit of a shift there, as well as the step edits***.
>
> ***And then in terms of how many payers we're seeing this across, it certainly is a meaningful amount to be able to influence the commercial landscape. And so for us, it was really important to dig into that to see what is the real impact to the business***, do we understand it, and what are the actions we can put in place to be able to move forward and feel really good about what the team has been able to put together there and certainly leading to the revised guidance and our plan for the back half of this year.

146. On this news, the price per share of the Company's common stock fell $0.87, or roughly 17.9%, from a price per share of $4.87 at the close of trading on August 6, 2026, to close at $4.00 on August 7, 2026.

147. Market analysts reacted swiftly to the Individual Defendants' disclosures. For example, Citigroup reduced its price target for the Company by 21%, to $11, and reported that "the issue [with the Company] is that increasingly burdensome payer requirements, including prior authorizations and step edits, emerged more quickly than anticipated and slowed new-patient conversion." Further, analysts with Leerink Partners reduced their price target for the Company by 19%, stating that "the primary headwind was a rapid increase in payer restrictions, including more string prior authorizations and expanded step-edit requirements, which slowed new patient starts and delayed prescription fulfillment rather than permanently blocking access." The Leerink Partners analysts further remarked that "[m]gmt. acknowledged that the magnitude and speed of these payers actions exceeded expectations as Ibsrela's commercial success attracted greater payer scrutiny."

**DAMAGES TO ARDELYX**

148. As a direct and proximate result of the Individual Defendants' conduct, Ardelyx will lose and expend, many millions of dollars.

149. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

150. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

151. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken

against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

152. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

153. As a direct and proximate result of the Individual Defendants' conduct, Ardelyx has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

## DERIVATIVE ALLEGATIONS

154. Plaintiff brings this action derivatively and for the benefit of Ardelyx to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Ardelyx, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and for violations of the Exchange Act.

155. Ardelyx is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

156. Plaintiff is, and has been at all relevant times, a shareholder of Ardelyx. Plaintiff will adequately and fairly represent the interests of Ardelyx in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

157. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

158. A pre-suit demand on the Board of Ardelyx is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants Raab, Bazemore, Bertrand, Bhanji, Cadoret-Manier, Mott, Parsey, and Rodgers (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the eight Director-Defendants who are on the Board at the time this action is commenced.

159. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

160. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Ardelyx to issue materially false and misleading statements. Specifically, the Director-Defendants caused Ardelyx to issue false and misleading statements which were intended to make Ardelyx appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls while one of the Director-Defendants engaged in lucrative insider sales netting proceeds of approximately $1.7 million. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

161. In addition, the Director-Defendants caused the 2025 Proxy Statement to call for a shareholder vote to approve the 2025 Amendment of the 2014 Equity Incentive Plan, thereby increasing the number of shares available for issuance thereunder by 10 million. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the 2025 Amendment of the 2014 Equity Incentive Plan, and they would not have likely approved such amendment had they been informed about the Individual Defendants' misconduct. Before shareholders approved the 2025 Amendment of the 2014 Equity Incentive Plan at the annual meeting of the stockholders on June 18, 2025, as of April 15, 2025, there were 8,359,043 shares available for issuance under the Amended and Restated 2014 Equity Incentive Plan. For this reason, the Individual Defendants, including the Director-Defendants, received material personal benefits that they otherwise would not receive but for the issuance of the 2025 Proxy Statement and the shareholders approving the 2025 Amendment of the 2014 Equity Incentive Plan that made an additional 10 million shares available under the Amended and Restated 2014 Equity Incentive Plan. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

162. Also, the Director-Defendants caused the 2026 Proxy Statement to call for a shareholder vote to approve the 2026 Amendment of the 2014 Equity Incentive Plan, thereby increasing the number of shares available for issuance thereunder by 9 million. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the 2026 Amendment of the 2014 Equity Incentive Plan, and they would not have likely approved such amendment had they been informed about the Individual Defendants' misconduct. Before shareholders approved the 2026 Amendment of the 2014 Equity Incentive Plan at the annual meeting of the stockholders on June 16, 2026, as of March 31, 2026, there were 10,240,799

shares available for issuance under the Amended and Restated 2014 Equity Incentive Plan. For this reason, the Individual Defendants, including the Director-Defendants, received material personal benefits that they otherwise would not receive but for the issuance of the 2026 Proxy Statement and the shareholders approving the 2026 Amendment of the 2014 Equity Incentive Plan that made an additional 9 million shares available under the Amended and Restated 2014 Equity Incentive Plan. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

163. Additional reasons that demand on Defendant Raab is futile follow. Defendant Raab has served as the Company's President and CEO since March 2009, and as a Company director since 2008. As such, the Company provides Defendant Raab with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, he is a non-independent director. As the Company's highest officer, he conducted little, if any, oversight the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein and personally made many of the false and misleading statements alleged herein. Further, Defendant Raab solicited the false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendant Mott and himself to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment of the 2014 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future. Also, Defendant Raab solicited the false and misleading 2026 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Bazemore, Bhanji, and Rodgers to the

Board, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2026 Amendment of the 2014 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future. In addition, Defendant Raab's insider sales, made while the Company's stock prices were artificially inflated because of the false and misleading statements alleged herein, further demonstrate his motive to participate in the scheme. Moreover, Defendant Raab is a defendant in the Securities Class Action. For these reasons, too, Defendant Raab breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

164. Additional reasons that demand on Defendant Bazemore is futile follow. Defendant Bazemore has served as a Company director since June 2016. Defendant Bazemore currently serves as a member of the Compensation and Leadership Development Committee. Defendant Bazemore has received, and continues to receive, sizeable compensation for his role as a Company director. As a long-time, trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Bazemore solicited the false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Raab and Mott to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment of the 2014 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future. Also, Defendant Bazemore solicited the false and misleading 2026 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Bhanji, Rodgers,

and himself to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2026 Amendment of the 2014 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future. For these reasons, too, Defendant Bazemore breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

165. Additional reasons that demand on Defendant Bertrand is futile follow. Defendant Bertrand has served as a Company director since October 2015. Defendant Bertrand currently serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant Bertrand has received, and continues to receive, sizeable compensation for his role as a Company director. As a long-time, trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Bertrand solicited the false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Raab and Mott to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment of the 2014 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future. Also, Defendant Bertrand solicited the false and misleading 2026 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Bazemore, Bhanji, and Rodgers to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2026 Amendment of the 2014 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future. For these reasons, too, Defendant Bertrand breached his

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

166. Additional reasons that demand on Defendant Bhanji is futile follow. Defendant Bhanji has served as a Company director since March 2021. Defendant Bhanji currently serves as a member of the Nominating and Corporate Governance Committee. Defendant Bhanji has received, and continues to receive, sizeable compensation for her role as a Company director. As a long-time, trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Further, Defendant Bhanji solicited the false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Raab and Mott to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment of the 2014 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future. Also, Defendant Bhanji solicited the false and misleading 2026 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Bazemore, Rodgers, and herself to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2026 Amendment of the 2014 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future. For these reasons, too, Defendant Bhanji breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

167. Additional reasons that demand on Defendant Cadoret-Manier is futile follow. Defendant Cadoret-Manier has served as a Company director since March 2020. Defendant

Cadoret-Manier currently serves as a member of the Compensation and Leadership Development Committee. Defendant Cadoret-Manier has received, and continues to receive, sizeable compensation for her role as a Company director. As a long-time, trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Further, Defendant Cadoret-Manier solicited the false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Raab and Mott to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment of the 2014 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future. Also, Defendant Cadoret-Manier solicited the false and misleading 2026 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Bazemore, Bhanji, and Rodgers to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2026 Amendment of the 2014 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future. For these reasons, too, Defendant Cadoret-Manier breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

168. Additional reasons that demand on Defendant Mott is futile follow. Defendant Mott has served as the Chairman of the Board since March 2014, and as a Company director since March 2009. Defendant Mott currently serves as the Chair of the Compensation and Leadership Development Committee and as a member of the Audit Committee. Defendant Mott has received, and continues to receive, sizeable compensation for his role as a Company director. As a long-

time, trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Mott solicited the false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendant Raab and himself to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment of the 2014 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future. Also, Defendant Mott solicited the false and misleading 2026 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Bazemore, Bhanji, and Rodgers to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2026 Amendment of the 2014 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future. For these reasons, too, Defendant Mott breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

169. Additional reasons that demand on Defendant Parsey is futile follow. Defendant Parsey has served as a Company director since April 2025. Defendant Parsey currently serves as a member of the Nominating and Corporate Governance Committee. Defendant Parsey has received, and continues to receive, sizeable compensation for his role as a Company director. As a long-time, trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Parsey solicited the false and

misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Raab and Mott to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment of the 2014 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future. Also, Defendant Parsey solicited the false and misleading 2026 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Bazemore, Bhanji, and Rodgers to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2026 Amendment of the 2014 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future. For these reasons, too, Defendant Parsey breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

170. Additional reasons that demand on Defendant Rodgers is futile follow. Defendant Rodgers has served as a Company director since March 2014. Defendant Rodgers currently serves as the Chair of the Audit Committee and as a member of the Compensation and Leadership Development Committee. Defendant Rodgers has received, and continues to receive, sizeable compensation for his role as a Company director. As a long-time, trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Further, Defendant Rodgers solicited the false and misleading 2025 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Raab and Mott to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2025 Amendment of the 2014 Equity Incentive Plan, thereby allowing the

Individual Defendants to materially benefit therefrom in the future. Also, Defendant Rodgers solicited the false and misleading 2026 Proxy Statement, which led to, *inter alia*, shareholders voting to re-elect Defendants Bazemore, Bhanji, and himself to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company, and the approval of the 2026 Amendment of the 2014 Equity Incentive Plan, thereby allowing the Individual Defendants to materially benefit therefrom in the future. For these reasons, too, Defendant Rodgers breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

171. Additional reasons that demand on the Board is futile follow.

172. Defendants Rodgers (as Chair), Bertrand, and Mott (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Audit Committee Charter. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

173. In violation of the Code of Ethics, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially

false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act. In further violation of the Code of Ethics, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, and conduct business in an honest and ethical manner. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

174. Ardelyx has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Ardelyx any part of the damages Ardelyx suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

175. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

176. The acts complained of herein constitute violations of fiduciary duties owed by Ardelyx's officers and directors, and these acts are incapable of ratification.

177. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Ardelyx. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Ardelyx, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

178. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Ardelyx to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

179. Thus, for all the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Defendants Raab, Bazemore, Bertrand, Bhanji, Cadoret-Manier, Mott, Parsey, and Rodgers for Violations of Section 14(a) of the Exchange Act**

180. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

181. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that:

> It shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

182. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

183. Under the direction and watch of Defendants Raab, Bazemore, Bertrand, Bhanji, Cadoret-Manier, Mott, Parsey, and Rodgers, the 2025 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

184. The 2025 Proxy Statement also failed to disclose that: (1) the Company encountered increasingly restrictive payer requirements for its drugs; (2) the Company encountered increasing patient access restrictions; (3) the Company's efforts to address the increasing payer requirements and patient access restrictions were inadequate; (4) as a result of the foregoing, the IBSRELA and XPHOZAH new-patient start rate slowed and harmed the drugs' financial prospects; and (5) the Company failed to maintain internal controls. As a result of the

foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

185. In the exercise of reasonable care, Defendants Raab, Bazemore, Bertrand, Bhanji, Cadoret-Manier, Mott, Parsey, and Rodgers knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the 2025 Proxy Statement, including but not limited to, the re-election of directors and the approval of the 2025 Amendment of the 2014 Equity Incentive Plan.

186. The false and misleading elements of the 2025 Proxy Statement led Company shareholders to vote to, *inter alia*: (1) re-elect Defendants Raab and Mott to hold office until the 2028 Annual Meeting of Stockholders; (2) approve, on a non-binding, advisory basis, the compensation of the Company's named executive officers; (3) ratify the selection of Ernst & Young LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2025; and (4) approve the 2025 Amendment of the 2014 Equity Incentive Plan.

187. Under the direction and watch of Defendants Raab, Bazemore, Bertrand, Bhanji, Cadoret-Manier, Mott, Parsey, and Rodgers, the 2026 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2026 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

188. The 2026 Proxy Statement also failed to disclose that: (1) the Company encountered increasingly restrictive payer requirements for its drugs; (2) the Company encountered increasing patient access restrictions; (3) the Company's efforts to address the increasing payer requirements and patient access restrictions were inadequate; (4) as a result of the foregoing, the IBSRELA and XPHOZAH new-patient start rate slowed and harmed the drugs' financial prospects; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

189. In the exercise of reasonable care, Defendants Raab, Bazemore, Bertrand, Bhanji, Cadoret-Manier, Mott, Parsey, and Rodgers knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2026 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the 2026 Proxy Statement, including but not limited to, the re-election of directors and the approval of the 2026 Amendment of the 2014 Equity Incentive Plan.

190. The false and misleading elements of the 2026 Proxy Statement led Company shareholders to vote to, *inter alia*: (1) re-elect Defendants Bazemore, Bhanji, and Rodgers to hold office until the 2029 Annual Meeting of Stockholders; (2) approve, on a non-binding, advisory basis, the compensation of the Company's named executive officers; (3) approve, on a non-binding, advisory basis, the frequency of an advisory vote to approve compensation of the Company's named executive officers; and (4) ratify the selection of Ernst & Young LLP as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2026; and (5) approve the 2026 Amendment of the 2014 Equity Incentive Plan.

191. The Company was damaged as a result of Defendants Raab's, Bazemore's, Bertrand's, Bhanji's, Cadoret-Manier's, Mott's, Parsey's, and Rodgers' material misrepresentations and omissions in the 2025 and 2026 Proxy Statements.

192. Plaintiff, on behalf of Ardelyx, has no adequate remedy at law.

**SECOND CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

193. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

194. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Ardelyx's business and affairs.

195. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

196. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Ardelyx.

197. In breach of their fiduciary duties owed to Ardelyx, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company encountered increasingly restrictive payer requirements for its drugs; (2) the Company encountered increasing patient access restrictions; (3) the Company's efforts to address the increasing payer requirements and patient access restrictions were inadequate; (4) as a result of the foregoing, the IBSRELA and XPHOZAH new-patient start rate slowed and harmed the drugs' financial prospects; and (5) the Company failed to maintain internal controls. As a result of the

foregoing, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

198. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact referenced herein, thus rendering them personally liable to the Company for breaching their fiduciary duties.

199. Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

200. Moreover, one of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider sales of Company common stock while the price of stock was artificially inflated, obtaining proceeds of ***approximately $1.7 million***.

201. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Ardelyx's securities.

202. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to

improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price Ardelyx's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

203. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

204. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Ardelyx has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

205. Plaintiff, on behalf of Ardelyx, has no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Unjust Enrichment**

206. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Ardelyx.

208. The Individual Defendants either benefitted financially from the improper conduct or received bonuses, stock options, or similar compensation from Ardelyx that was tied to the performance or artificially inflated valuation of Ardelyx, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

209. Plaintiff, as a shareholder and a representative of Ardelyx, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from

benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

210. Plaintiff, on behalf of Ardelyx, has no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Waste of Corporate Assets**

211. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

212. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Ardelyx to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions (as evidenced, for example, by the Securities Class Action), to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

213. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

214. Plaintiff, on behalf of Ardelyx, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

215. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

216. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard

to prudently managing the assets and business of Ardelyx in a manner consistent with the operations of a publicly held corporation.

217. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Ardelyx has sustained and will continue to sustain significant damages.

218. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

219. Plaintiff, on behalf of Ardelyx, has no adequate remedy at law.

## SIXTH CLAIM
### Against the Individual Defendants for Abuse of Control

220. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

221. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Ardelyx, for which they are legally responsible.

222. As a direct and proximate result of the Individual Defendants' abuse of control, Ardelyx has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

223. Plaintiff, on behalf of Ardelyx, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Raab, Renz, Hohenleitner, and Foster for Contribution Under Sections 10(b) and 21D of the Exchange Act

224. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

225. Ardelyx and Defendants Raab, Renz, Hohenleitner, and Foster are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws

for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Raab's, Renz's, Hohenleitner's and Foster's willful and/or reckless violations of their obligations as officers and/or directors of Ardelyx.

226. Defendants Raab, Renz, Hohenleitner, and Foster, because of their positions of control and authority as officers and/or directors of Ardelyx, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Ardelyx, including the wrongful acts complained of herein and in the Securities Class Action.

227. Accordingly, Defendants Raab, Renz, Hohenleitner, and Foster are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

228. As such, Ardelyx is entitled to receive all appropriate contribution or indemnification from Defendants Raab, Renz, Hohenleitner, and Foster.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Ardelyx, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that each of the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Ardelyx;

(c) Determining and awarding to Ardelyx the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and

severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Ardelyx and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Ardelyx and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Ardelyx to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding Ardelyx restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: October 13, 2026

**THE BROWN LAW FIRM, P.C.**

*/s/Elizabeth Donohoe*
Elizabeth Donohoe (BBO #716357)
Timothy Brown
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: edonohoe@thebrownlawfirm.net
tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

# VERIFICATION

I, Felicia Marti, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 13th day of October 2026.

DocuSigned by:

BF3323A39CF3498...

Felicia Marti